(Slip Opinion) OCTOBER TERM, 2013 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PRADO NAVARETTE ET AL. *v.* CALIFORNIA

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

No. 12–9490.   Argued January 21, 2014—Decided April 22, 2014

A California Highway Patrol officer stopped the pickup truck occupied by petitioners because it matched the description of a vehicle that a 911 caller had recently reported as having run her off the road. As he and a second officer approached the truck, they smelled marijuana. They searched the truck's bed, found 30 pounds of marijuana, and arrested petitioners. Petitioners moved to suppress the evidence, arguing that the traffic stop violated the Fourth Amendment. Their motion was denied, and they pleaded guilty to transporting marijuana. The California Court of Appeal affirmed, concluding that the officer had reasonable suspicion to conduct an investigative stop.

*Held*: The traffic stop complied with the Fourth Amendment because, under the totality of the circumstances, the officer had reasonable suspicion that the truck's driver was intoxicated. Pp. 3–11.

(a) The Fourth Amendment permits brief investigative stops when an officer has "a particularized and objective basis for suspecting the particular person stopped of . . . criminal activity." *United States* v. *Cortez*, 449 U. S. 411, 417–418. Reasonable suspicion takes into account "the totality of the circumstances," *id.*, at 417, and depends "upon both the content of information possessed by police and its degree of reliability," *Alabama* v. *White*, 496 U. S. 325, 330. An anonymous tip alone seldom demonstrates sufficient reliability, *White,* 496 U. S., at 329, but may do so under appropriate circumstances, *id.*, at 327. Pp. 3–5.

(b) The 911 call in this case bore adequate indicia of reliability for the officer to credit the caller's account. By reporting that she had been run off the road by a specific vehicle, the caller necessarily claimed an eyewitness basis of knowledge. The apparently short time between the reported incident and the 911 call suggests that the

Syllabus

caller had little time to fabricate the report. And a reasonable officer could conclude that a false tipster would think twice before using the 911 system, which has several technological and regulatory features that safeguard against making false reports with immunity. Pp. 5–8.

(c) Not only was the tip here reliable, but it also created reasonable suspicion of drunk driving. Running another car off the road suggests the sort of impairment that characterizes drunk driving. While that conduct might be explained by another cause such as driver distraction, reasonable suspicion "need not rule out the possibility of innocent conduct." *United States* v. *Arvizu*, 534 U. S. 266, 277. Finally, the officer's failure to observe additional suspicious conduct during the short period that he followed the truck did not dispel the reasonable suspicion of drunk driving, and the officer was not required to surveil the truck for a longer period. Pp. 8–10.

Affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, and ALITO, JJ., joined. SCALIA, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 12–9490

—————

## LORENZO PRADO NAVARETTE AND JOSE PRADO NAVARETTE, PETITIONERS *v.* CALIFORNIA

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT*

[April 22, 2014]

JUSTICE THOMAS delivered the opinion of the Court.

After a 911 caller reported that a vehicle had run her off the road, a police officer located the vehicle she identified during the call and executed a traffic stop. We hold that the stop complied with the Fourth Amendment because, under the totality of the circumstances, the officer had reasonable suspicion that the driver was intoxicated.

I

On August 23, 2008, a Mendocino County 911 dispatch team for the California Highway Patrol (CHP) received a call from another CHP dispatcher in neighboring Humboldt County. The Humboldt County dispatcher relayed a tip from a 911 caller, which the Mendocino County team recorded as follows: "'Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925. Ran the reporting party off the roadway and was last seen approximately five [minutes] ago.'" App. 36a. The Mendocino County team then broadcast that information to CHP officers at 3:47 p.m.

A CHP officer heading northbound toward the reported vehicle responded to the broadcast. At 4:00 p.m., the

officer passed the truck near mile marker 69. At about 4:05 p.m., after making a U-turn, he pulled the truck over. A second officer, who had separately responded to the broadcast, also arrived on the scene. As the two officers approached the truck, they smelled marijuana. A search of the truck bed revealed 30 pounds of marijuana. The officers arrested the driver, petitioner Lorenzo Prado Navarette, and the passenger, petitioner José Prado Navarette.

Petitioners moved to suppress the evidence, arguing that the traffic stop violated the Fourth Amendment because the officer lacked reasonable suspicion of criminal activity. Both the magistrate who presided over the suppression hearing and the Superior Court disagreed.[1] Petitioners pleaded guilty to transporting marijuana and were sentenced to 90 days in jail plus three years of probation.

The California Court of Appeal affirmed, concluding that the officer had reasonable suspicion to conduct an investigative stop. 2012 WL 4842651 (Oct. 12, 2012). The court reasoned that the content of the tip indicated that it came from an eyewitness victim of reckless driving, and that the officer's corroboration of the truck's description, location, and direction established that the tip was reliable enough to justify a traffic stop. *Id.,* at *7. Finally, the court concluded that the caller reported driving that was sufficiently dangerous to merit an investigative stop without waiting for the officer to observe additional reckless driving himself. *Id.,* at *9. The California Supreme Court

_____

[1] At the suppression hearing, counsel for petitioners did not dispute that the reporting party identified herself by name in the 911 call recording. Because neither the caller nor the Humboldt County dispatcher who received the call was present at the hearing, however, the prosecution did not introduce the recording into evidence. The prosecution proceeded to treat the tip as anonymous, and the lower courts followed suit. See 2012 WL 4842651, *6 (Cal. Ct. App., Oct. 12, 2012).

denied review. We granted certiorari, 570 U. S. \_\_\_ (2013), and now affirm.

## II

The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez*, 449 U. S. 411, 417–418 (1981); see also *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama* v. *White*, 496 U. S. 325, 330 (1990). The standard takes into account "the totality of the circumstances—the whole picture." *Cortez*, *supra,* at 417. Although a mere "'hunch'" does not create reasonable suspicion, *Terry*, *supra,* at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989).

## A

These principles apply with full force to investigative stops based on information from anonymous tips. We have firmly rejected the argument "that reasonable cause for a[n investigative stop] can only be based on the officer's personal observation, rather than on information supplied by another person." *Adams* v. *Williams*, 407 U. S. 143, 147 (1972). Of course, "an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity." *White*, 496 U. S., at 329 (emphasis added). That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," and an anonymous tipster's veracity is "'by hypoth-

esis largely unknown, and unknowable.'" *Ibid.* But under appropriate circumstances, an anonymous tip can demonstrate "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Id.*, at 327.

Our decisions in *Alabama* v. *White*, 496 U. S. 325 (1990), and *Florida* v. *J. L.*, 529 U. S. 266 (2000), are useful guides. In *White*, an anonymous tipster told the police that a woman would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail light. The tipster further asserted that the woman would be transporting cocaine. 496 U. S., at 327. After confirming the innocent details, officers stopped the station wagon as it neared the motel and found cocaine in the vehicle. *Id.,* at 331. We held that the officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity. By accurately predicting future behavior, the tipster demonstrated "a special familiarity with respondent's affairs," which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." *Id.,* at 332. We also recognized that an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, "including the claim that the object of the tip is engaged in criminal activity." *Id.,* at 331 (citing *Illinois* v. *Gates*, 462 U. S. 213, 244 (1983)).

In *J. L.*, by contrast, we determined that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun. 529 U. S., at 268. The tipster did not explain how he knew about the gun, nor did he suggest that he had any special familiarity with the young man's affairs. *Id.,* at 271. As a result, police had no basis for believing "that the tipster ha[d] knowledge of concealed criminal activity." *Id.,* at 272. Furthermore, the tip included no predictions of future behavior that could be corroborated to assess the

tipster's credibility. *Id.,* at 271. We accordingly concluded that the tip was insufficiently reliable to justify a stop and frisk.

## B

The initial question in this case is whether the 911 call was sufficiently reliable to credit the allegation that petitioners' truck "ran the [caller] off the roadway." Even assuming for present purposes that the 911 call was anonymous, see n. 1, *supra*, we conclude that the call bore adequate indicia of reliability for the officer to credit the caller's account. The officer was therefore justified in proceeding from the premise that the truck had, in fact, caused the caller's car to be dangerously diverted from the highway.

By reporting that she had been run off the road by a specific vehicle—a silver Ford F-150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability. See *Gates*, *supra*, at 234 ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"); *Spinelli* v. *United States*, 393 U. S. 410, 416 (1969) (a tip of illegal gambling is less reliable when "it is not alleged that the informant personally observed [the defendant] at work or that he had ever placed a bet with him"). This is in contrast to *J. L.*, where the tip provided no basis for concluding that the tipster had actually seen the gun. 529 U. S., at 271. Even in *White*, where we upheld the stop, there was scant evidence that the tipster had actually observed cocaine in the station wagon. We called *White* a "'close case'" because "[k]nowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not

necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." 529 U. S., at 271. A driver's claim that another vehicle ran her off the road, however, necessarily implies that the informant knows the other car was driven dangerously.

There is also reason to think that the 911 caller in this case was telling the truth. Police confirmed the truck's location near mile marker 69 (roughly 19 highway miles south of the location reported in the 911 call) at 4:00 p.m. (roughly 18 minutes after the 911 call). That timeline of events suggests that the caller reported the incident soon after she was run off the road. That sort of contemporaneous report has long been treated as especially reliable. In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy because "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Advisory Committee's Notes on Fed. Rule Evid. 803(1), 28 U. S. C. App., p. 371 (describing the rationale for the hearsay exception for "present sense impression[s]"). A similar rationale applies to a "statement relating to a startling event"—such as getting run off the road—"made while the declarant was under the stress of excitement that it caused." Fed. Rule Evid. 803(2) (hearsay exception for "excited utterances"). Unsurprisingly, 911 calls that would otherwise be inadmissible hearsay have often been admitted on those grounds. See D. Binder, Hearsay Handbook §8.1, pp. 257–259 (4th ed. 2013–2014) (citing cases admitting 911 calls as present sense impressions); *id.,* §9.1, at 274–275 (911 calls admitted as excited utterances). There was no indication that the tip in *J. L.* (or even in *White*) was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event, but those considerations weigh in favor of the caller's veracity here.

Another indicator of veracity is the caller's use of the 911 emergency system. See Brief for Respondent 40–41, 44; Brief for United States as *Amicus Curiae* 16–18. A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity. See *J. L.*, *supra,* at 276 (KENNEDY, J., concurring). As this case illustrates, see n. 1, *supra*, 911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution, see, *e.g.,* Cal. Penal Code Ann. §653x (West 2010) (makes "telephon[ing] the 911 emergency line with the intent to annoy or harass" punishable by imprisonment and fine); see also §148.3 (2014 West Cum. Supp.) (prohibits falsely reporting "that an 'emergency' exists"); §148.5 (prohibits falsely reporting "that a felony or misdemeanor has been committed"). The 911 system also permits law enforcement to verify important information about the caller. In 1998, the Federal Communications Commission (FCC) began to require cellular carriers to relay the caller's phone number to 911 dispatchers. 47 CFR §20.18(d)(1) (2013) (FCC's "Phase I enhanced 911 services" requirements). Beginning in 2001, carriers have been required to identify the caller's geographic location with increasing specificity. §§20.18(e)–(h) ("Phase II enhanced 911 service" requirements). And although callers may ordinarily block call recipients from obtaining their identifying information, FCC regulations exempt 911 calls from that privilege. §§64.1601(b), (d)(4)(ii) ("911 emergency services" exemption from rule that, when a caller so requests, "a carrier may not reveal that caller's number or name"). None of this is to suggest that tips in 911 calls are *per se* reliable. Given the foregoing technological and regulatory developments, however, a reasonable officer could conclude that a false tipster would think twice before using such a system. The caller's use of the 911 system is therefore one of the relevant circum-

stances that, taken together, justified the officer's reliance on the information reported in the 911 call.

C

Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U. S., at 30. We must therefore determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness. See *Cortez*, 449 U. S., at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity"). We conclude that the behavior alleged by the 911 caller, "viewed from the standpoint of an objectively reasonable police officer, amount[s] to reasonable suspicion" of drunk driving. *Ornelas* v. *United States*, 517 U. S. 690, 696 (1996). The stop was therefore proper.[2]

Reasonable suspicion depends on "'"the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."'" *Id.*, at 695. Under that commonsense approach, we can appropriately recognize certain driving behaviors as sound indicia of drunk driving. See, *e.g., People* v. *Wells*, 38 Cal. 4th 1078, 1081, 136 P. 3d 810, 811 (2006) ("'weaving all over the roadway'"); *State* v. *Prendergast*, 103 Haw. 451, 452–453, 83 P. 3d 714, 715–716 (2004) ("cross[ing] over the center line" on a highway and "almost caus[ing] several head-on collisions"); *State* v. *Golotta*, 178 N. J. 205, 209, 837 A. 2d 359, 361 (2003) (driving "'all over the road'" and "'weaving back and forth'"); *State* v.

—————

[2] Because we conclude that the 911 call created reasonable suspicion of an ongoing crime, we need not address under what circumstances a stop is justified by the need to investigate completed criminal activity. Cf. *United States* v. *Hensley*, 469 U. S. 221, 229 (1985).

*Walshire*, 634 N. W. 2d 625, 626 (Iowa 2001) ("driving in the median"). Indeed, the accumulated experience of thousands of officers suggests that these sorts of erratic behaviors are strongly correlated with drunk driving. See Nat. Highway Traffic Safety Admin., The Visual Detection of DWI Motorists 4–5 (Mar. 2010), online at http://nhtsa.gov/staticfiles/nti/pdf/808677.pdf (as visited Apr. 18, 2014, and available in Clerk of Court's case file). Of course, not all traffic infractions imply intoxication. Unconfirmed reports of driving without a seatbelt or slightly over the speed limit, for example, are so tenuously connected to drunk driving that a stop on those grounds alone would be constitutionally suspect. But a reliable tip alleging the dangerous behaviors discussed above generally would justify a traffic stop on suspicion of drunk driving.

The 911 caller in this case reported more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway. That conduct bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness. Running another vehicle off the road suggests lane-positioning problems, decreased vigilance, impaired judgment, or some combination of those recognized drunk driving cues. See Visual Detection of DWI Motorists 4–5. And the experience of many officers suggests that a driver who almost strikes a vehicle or another object—the exact scenario that ordinarily causes "running [another vehicle] off the roadway"—is likely intoxicated. See *id.*, at 5, 8. As a result, we cannot say that the officer acted unreasonably under these circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving.

Petitioners' attempts to second-guess the officer's rea-

sonable suspicion of drunk driving are unavailing. It is true that the reported behavior might also be explained by, for example, a driver responding to "an unruly child or other distraction." Brief for Petitioners 21. But we have consistently recognized that reasonable suspicion "need not rule out the possibility of innocent conduct." *United States* v. *Arvizu*, 534 U. S. 266, 277 (2002).

Nor did the absence of additional suspicious conduct, after the vehicle was first spotted by an officer, dispel the reasonable suspicion of drunk driving. Brief for Petitioners 23–24. It is hardly surprising that the appearance of a marked police car would inspire more careful driving for a time. Cf. *Arvizu, supra,* at 275 ("'[s]lowing down after spotting a law enforcement vehicle'" does not dispel reasonable suspicion of criminal activity). Extended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication, but the 5-minute period in this case hardly sufficed in that regard. Of course, an officer who already has such a reasonable suspicion need not surveil a vehicle at length in order to personally observe suspicious driving. See *Adams* v. *Williams*, 407 U. S., at 147 (repudiating the argument that "reasonable cause for a[n investigative stop] can only be based on the officer's personal observation"). Once reasonable suspicion of drunk driving arises, "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *Sokolow*, 490 U. S., at 11. This would be a particularly inappropriate context to depart from that settled rule, because allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences.

## III

Like *White*, this is a "close case." 496 U. S., at 332. As in that case, the indicia of the 911 caller's reliability here

are stronger than those in *J. L.*, where we held that a bare-bones tip was unreliable. 529 U. S., at 271. Although the indicia present here are different from those we found sufficient in *White*, there is more than one way to demonstrate "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U. S., at 417–418. Under the totality of the circumstances, we find the indicia of reliability in this case sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road. That made it reasonable under the circumstances for the officer to execute a traffic stop. We accordingly affirm.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–9490

_____

## LORENZO PRADO NAVARETTE AND JOSE PRADO NAVARETTE, PETITIONERS *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF
CALIFORNIA, FIRST APPELLATE DISTRICT

[April 22, 2014]

JUSTICE SCALIA, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The California Court of Appeal in this case relied on jurisprudence from the California Supreme Court (adopted as well by other courts) to the effect that "an anonymous and uncorroborated tip regarding a possibly intoxicated highway driver" provides without more the reasonable suspicion necessary to justify a stop. *People* v. *Wells*, 38 Cal. 4th l078, 1082, 136 P. 3d 810, 812, (2006). See also, *e.g.*, *United States* v. *Wheat*, 278 F. 3d 722, 729–730 (CA8 2001); *State* v. *Walshire*, 634 N. W. 2d 625, 626–627, 630 (Iowa 2001). Today's opinion does not explicitly adopt such a departure from our normal Fourth Amendment requirement that anonymous tips must be corroborated; it purports to adhere to our prior cases, such as *Florida* v. *J. L.*, 529 U. S. 266 (2000), and *Alabama* v. *White*, 496 U. S. 325 (1990). Be not deceived.

Law enforcement agencies follow closely our judgments on matters such as this, and they will identify at once our new rule: So long as the caller identifies where the car is, anonymous claims of a single instance of possibly careless or reckless driving, called in to 911, will support a traffic stop. This is not my concept, and I am sure would not be the Framers', of a people secure from unreasonable searches and seizures. I would reverse the judgment of

the Court of Appeal of California.

## I

The California Highway Patrol in this case knew nothing about the tipster on whose word—and that alone—they seized Lorenzo and José Prado Navarette. They did not know her name.[1] They did not know her phone number or address. They did not even know where she called from (she may have dialed in from a neighboring county, App. 33a–34a).

The tipster said the truck had "[run her] off the roadway," *id.,* at 36a, but the police had no reason to credit that charge and many reasons to doubt it, beginning with the peculiar fact that the accusation was anonymous. "[E]liminating accountability . . . is ordinarily the very purpose of anonymity." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 385 (1995) (SCALIA, J., dissenting). The unnamed tipster "can lie with impunity," *J. L.*, *supra,* at 275 (KENNEDY, J., concurring). Anonymity is especially suspicious with respect to the call that is the subject of the present case. When does a victim complain to the police about an arguably criminal act (running the victim off the road) without giving his identity, so that he can accuse and testify when the culprit is caught?

The question before us, the Court agrees, *ante*, at 8, is whether the "content of information possessed by police and its degree of reliability," *White*, 496 U. S., at 330, gave the officers reasonable suspicion that the driver of the truck (Lorenzo) was committing an ongoing crime. When the only source of the government's information is an informant's tip, we ask whether the tip bears sufficient "'indicia of reliability,'" *id.*, at 328, to establish "a particularized and objective basis for suspecting the particular

---

[1] There was some indication below that the tipster was a woman. See App. 18a. Beyond that detail, we must, as the Court notes, *ante*, at 2, n. 1, assume that the identity of the tipster was unknown.

person stopped of criminal activity," *United States* v. *Cortez*, 449 U. S. 411, 417–418 (1981).

The most extreme case, before this one, in which an anonymous tip was found to meet this standard was *White, supra.* There the reliability of the tip was established by the fact that it predicted the target's behavior in the finest detail—a detail that could be known only by someone familiar with the target's business: She would, the tipster said, leave a particular apartment building, get into a brown Plymouth station wagon with a broken right tail light, and drive immediately to a particular motel. *Id.*, at 327. Very few persons would have such intimate knowledge, and hence knowledge of the unobservable fact that the woman was carrying unlawful drugs was plausible. *Id.*, at 332. Here the Court makes a big deal of the fact that the tipster was dead right about the fact that a silver Ford F-150 truck (license plate 8D94925) was traveling south on Highway 1 somewhere near mile marker 88. But everyone in the world who saw the car would have that knowledge, and anyone who wanted the car stopped would have to provide that information. Unlike the situation in *White*, that generally available knowledge in no way makes it plausible that the tipster saw the car run someone off the road.

The Court says, *ante,* at 5, that "[b]y reporting that she had been run off the road by a specific vehicle . . . the caller necessarily claimed eyewitness knowledge." So what? The issue is not how she claimed to know, but whether what she claimed to know was true. The claim to "eyewitness knowledge" of being run off the road supports *not at all* its veracity; nor does the amazing, mystifying prediction (so far short of what existed in *White*) that the petitioners' truck *would be heading south on Highway 1*.

The Court finds "reason to think" that the informant "was telling the truth" in the fact that police observation confirmed that the truck had been driving near the spot at

which, and at the approximate time at which, the tipster alleged she had been run off the road. *Ante*, at 6. According to the Court, the statement therefore qualifies as a "'present sense impression'" or "'excited utterance,'" kinds of hearsay that the law deems categorically admissible given their low likelihood of reflecting "'deliberate or conscious misrepresentation.'" *Ibid.* (quoting Advisory Committee's Notes on Fed. Rule Evid. 803(1), 28 U. S. C. App., p. 371). So, the Court says, we can fairly suppose that the accusation was true.

No, we cannot. To begin with, it is questionable whether either the "present sense impression" or the "excited utterance" exception to the hearsay rule applies here. The classic "present sense impression" is the recounting of an event that is occurring before the declarant's eyes, as the declarant is speaking ("I am watching the Hindenburg explode!"). See 2 K. Broun, McCormick on Evidence 362 (7th ed. 2013) (hereinafter McCormick). And the classic "excited utterance" is a statement elicited, almost involuntarily, by the shock of what the declarant is immediately witnessing ("My God, those people will be killed!"). See *id.,* at 368–369. It is the immediacy that gives the statement some credibility; the declarant has not had time to dissemble or embellish. There is no such immediacy here. The declarant had time to observe the license number of the offending vehicle, 8D94925 (a difficult task if she was forced off the road and the vehicle was speeding away), to bring her car to a halt, to copy down the observed license number (presumably), and (if she was using her own cell phone) to dial a call to the police from the stopped car. Plenty of time to dissemble or embellish.

Moreover, even assuming that less than true immediacy will suffice for these hearsay exceptions to apply, the tipster's statement would run into additional barriers to admissibility and acceptance. According to the very Advisory Committee's Notes from which the Court quotes,

cases addressing an unidentified declarant's present sense impression "indicate hesitancy in upholding the statement alone as sufficient" proof of the reported event. 28 U. S. C. App., at 371; see also 7 M. Graham, Handbook of Federal Evidence 19–20 (7th ed. 2012). For excited utterances as well, the "knotty theoretical" question of statement-alone admissibility persists—seemingly even when the declarant is known. 2 McCormick 368. "Some courts . . . have taken the position that an excited utterance is admissible only if other proof is presented which supports a finding of fact that the exciting event did occur. The issue has not yet been resolved under the Federal Rules." *Id.,* at 367–368 (footnote omitted). It is even unsettled whether excited utterances of an unknown declarant are *ever* admissible. A leading treatise reports that "the courts have been reluctant to admit such statements, principally because of uncertainty that foundational requirements, including the impact of the event on the declarant, have been satisfied." *Id.,* at 372. In sum, it is unlikely that the law of evidence would deem the mystery caller in this case "especially trustworthy," *ante*, at 6.

Finally, and least tenably, the Court says that another "indicator of veracity" is the anonymous tipster's mere "use of the 911 emergency system," *ante*, at 7. Because, you see, recent "technological and regulatory develop-ments" suggest that the identities of unnamed 911 callers are increasingly less likely to remain unknown. *Ibid.* Indeed, the systems are able to identify "the caller's geo-graphic location with increasing specificity." *Ibid. Amici* disagree with this, see Brief for National Association of Criminal Defense Lawyers et al. 8–12, and the present case surely suggests that *amici* are right—since we know neither the identity of the tipster nor even the county from which the call was made. But assuming the Court is right about the ease of identifying 911 callers, it proves abso-lutely nothing in the present case unless the anonymous

caller was *aware* of that fact. "It is the tipster's *belief* in anonymity, not its *reality*, that will control his behavior." *Id.*, at 10 (emphasis added). There is no reason to believe that your average anonymous 911 tipster is aware that 911 callers are readily identifiable.[2]

## II

All that has been said up to now assumes that the anonymous caller made, at least in effect, an accusation of drunken driving. But in fact she did not. She said that the petitioners' truck "'[r]an [me] off the roadway.'" App. 36a. That neither asserts that the driver was drunk nor even raises the *likelihood* that the driver was drunk. The most it conveys is that the truck did some apparently nontypical thing that forced the tipster off the roadway, whether partly or fully, temporarily or permanently. Who really knows what (if anything) happened? The truck might have swerved to avoid an animal, a pothole, or a jaywalking pedestrian.

But let us assume the worst of the many possibilities: that it was a careless, reckless, or even intentional maneuver that forced the tipster off the road. Lorenzo might have been distracted by his use of a hands-free cell phone, see Strayer, Drews, & Crouch, A Comparison of the Cell Phone Driver and the Drunk Driver, 48 Human Factors 381, 388 (2006), or distracted by an intense sports argument with José, see D. Strayer et al., AAA Foundation for Traffic Safety, Measuring Cognitive Distraction in the Automobile 28 (June 2013), online at https://www.aaafoundation.org/sites/default/files/MeasuringCognitiveDistractions.pdf as visited Apr. 17, 2014, and available in Clerk of Court's case file).

––––––––

[2] The Court's discussion of reliable 911 traceability has so little relevance to the present case that one must surmise it has been included merely to assure officers in the future that anonymous 911 accusations—even untraced ones—are not as suspect (and hence as unreliable) as other anonymous accusations. That is unfortunate.

Or, indeed, he might have intentionally forced the tipster off the road because of some personal animus, or hostility to her "Make Love, Not War" bumper sticker. I fail to see how reasonable suspicion of a *discrete instance* of irregular or hazardous driving generates a reasonable suspicion of *ongoing intoxicated driving*. What proportion of the hundreds of thousands—perhaps millions—of careless, reckless, or intentional traffic violations committed each day is attributable to drunken drivers? I say 0.1 percent. I have no basis for that except my own guesswork. But unless the Court has some basis in reality to believe that the proportion is many orders of magnitude above that—say 1 in 10 or at least 1 in 20—it has no grounds for its unsupported assertion that the tipster's report in this case gave rise to a *reasonable suspicion* of drunken driving.

Bear in mind that that is the only basis for the stop that has been asserted in this litigation.[3] The stop required suspicion of an ongoing crime, not merely suspicion of having run someone off the road earlier. And driving while being a careless or reckless person, unlike driving while being a drunk person, is not an ongoing crime. In other words, in order to stop the petitioners the officers here not only had to assume without basis the accuracy of the anonymous accusation but also had to posit an unlikely reason (drunkenness) for the accused behavior.

In sum, at the moment the police spotted the truck, it was more than merely "*possib[le]*" that the petitioners were not committing an ongoing traffic crime. *United States* v. *Arvizu*, 534 U. S. 266, 277 (2002) (emphasis

_____

[3] The circumstances that may justify a stop under *Terry* v. *Ohio*, 392 U. S. 1 (1968), to investigate past criminal activity are far from clear, see *United States* v. *Hensley*, 469 U. S. 221, 229 (1985), and have not been discussed in this litigation. Hence, the Court says it "need not address" that question. *Ante*, at 8, n. 2. I need not either. This case has been litigated on the assumption that only suspicion of ongoing intoxicated or reckless driving could have supported this stop.

added).  It was overwhelmingly likely that they were not.

### III

It gets worse.  Not only, it turns out, did the police have no good reason *at first* to believe that Lorenzo was driving drunk, they had very good reason *at last* to know that he was not.  The Court concludes that the tip, plus confirmation of the truck's location, produced reasonable suspicion that the truck not only had been *but still was* barreling dangerously and drunkenly down Highway 1.  *Ante,* at 8– 10.  In fact, alas, it was not, and the officers knew it.  They followed the truck for five minutes, presumably to see if it was being operated recklessly.  And *that* was good police work.  While the anonymous tip was not enough to support a stop for drunken driving under *Terry* v. *Ohio*, 392 U. S. 1 (1968), it was surely enough to counsel observation of the truck to see if it was driven by a drunken driver. But the pesky little detail left out of the Court's reasonable-suspicion equation is that, for the five minutes that the truck was being followed (five minutes is a *long* time), Lorenzo's driving was irreproachable.  Had the officers witnessed the petitioners violate a single traffic law, they would have had cause to stop the truck, *Whren* v. *United States*, 517 U. S. 806, 810 (1996), and this case would not be before us.  And not only was the driving *irreproachable*, but the State offers no evidence to suggest that the petitioners even did anything *suspicious*, such as suddenly slowing down, pulling off to the side of the road, or turning somewhere to see whether they were being followed.  Cf. *Arvizu, supra,* at 270–271, 277 (concluding that an officer's suspicion of criminality was enhanced when the driver, upon seeing that he was being followed, "slowed dramatically," "appeared stiff," and "seemed to be trying to pretend" that the patrol car was not there).  Consequently, the tip's suggestion of ongoing drunken driving (if it could be deemed to suggest that) not only went uncorroborated;

it was affirmatively undermined.

A hypothetical variation on the facts of this case illustrates the point. Suppose an anonymous tipster reports that, while following near mile marker 88 a silver Ford F-150, license plate 8D949925, traveling southbound on Highway 1, she saw in the truck's open cab several five-foot-tall stacks of what was unmistakably baled cannabis. Two minutes later, a highway patrolman spots the truck exactly where the tip suggested it would be, begins following it, but sees nothing in the truck's cab. It is not enough to say that the officer's observation merely failed to corroborate the tipster's accusation. It is more precise to say that the officer's observation *discredited* the informant's accusation: The crime was supposedly occurring (and would continue to occur) in plain view, but the police saw nothing. Similarly, here, the crime supposedly suggested by the tip was ongoing intoxicated driving, the hallmarks of which are many, readily identifiable, and difficult to conceal. That the officers witnessed nary a minor traffic violation nor any other "sound indici[um] of drunk driving," *ante*, at 8, strongly suggests that the suspected crime was *not* occurring after all. The tip's implication of continuing criminality, already weak, grew even weaker.

Resisting this line of reasoning, the Court curiously asserts that, since drunk drivers who see marked squad cars in their rearview mirrors may evade detection simply by driving "more careful[ly]," the "absence of additional suspicious conduct" is "hardly surprising" and thus largely irrelevant. *Ante*, at 10. Whether a drunk driver drives drunkenly, the Court seems to think, is up to him. That is not how I understand the influence of alcohol. I subscribe to the more traditional view that the dangers of intoxicated driving are the intoxicant's impairing effects on the body—effects that no mere act of the will can resist. See, *e.g.*, A. Dasgupta, The Science of Drinking: How Alcohol Affects Your Body and Mind 39 (explaining that the physi-

ological effect of a blood alcohol content between 0.08 and 0.109, for example, is "sever[e] impair[ment]" of "[b]alance, speech, hearing, and reaction time," as well as one's general "ability to drive a motor vehicle"). Consistent with this view, I take it as a fundamental premise of our intoxicated-driving laws that a driver soused enough to swerve once can be expected to swerve again—and soon. If he does not, and if the only evidence of his first episode of irregular driving is a mere inference from an uncorroborated, vague, and nameless tip, then the Fourth Amendment requires that he be left alone.

\* \* \*

The Court's opinion serves up a freedom-destroying cocktail consisting of two parts patent falsity: (1) that anonymous 911 reports of traffic violations are reliable so long as they correctly identify a car and its location, and (2) that a single instance of careless or reckless driving necessarily supports a reasonable suspicion of drunkenness. All the malevolent 911 caller need do is assert a traffic violation, and the targeted car will be stopped, forcibly if necessary, by the police. If the driver turns out not to be drunk (which will almost always be the case), the caller need fear no consequences, even if 911 knows his identity. After all, he never alleged drunkenness, but merely called in a traffic violation—and on that point his word is as good as his victim's.

Drunken driving is a serious matter, but so is the loss of our freedom to come and go as we please without police interference. To prevent and detect murder we do not allow searches without probable cause or targeted *Terry* stops without reasonable suspicion. We should not do so for drunken driving either. After today's opinion all of us on the road, and not just drug dealers, are at risk of having our freedom of movement curtailed on suspicion of drunkenness, based upon a phone tip, true or false, of a

single instance of careless driving.  I respectfully dissent.