Filed 10/27/14  P. v. Espinoza CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS FELIPE ESPINOZA et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B250378<br>(Super. Ct. No. F490936-DE007, -DE013)<br>(San Luis Obispo County) |

Carlos Felipe Espinoza appeals a judgment entered following his nolo contendere plea to transportation of marijuana.  (Health & Saf. Code, § 11360, subd. (a).)  We affirm.

Jesus Antonio Lomero Gonzalez appeals a judgment entered following his nolo contendere plea to conspiracy to commit transportation of marijuana.  (Pen. Code, § 182, subd. (a)(1)[1]; Health & Saf. Code, § 11360, subd. (a).)  We affirm.

### FACTS AND PROCEDURAL HISTORY

On May 28, 2013, San Luis Obispo County Sheriff's Deputy Gerald Lee Giese received an anonymous telephone call stating that a "panga" boat would be offloaded at Montana de Oro State Park that evening.[2]  Giese established a surveillance

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

[2] A panga boat is "an open-bow vessel commonly used for smuggling."  (*United States v. Ramos-Atondo* (9th Cir. 2013) 732 F.3d 1113, 1117.)

team in the park area who observed four vehicles enter and leave the park several times in the late evening and early morning hours. Shortly thereafter, Giese received information from the United States Coast Guard that a panga boat was beached at the park. Deputies then stopped the four vehicles as they left the park within a few minutes of each other. The occupants wore wet and sandy clothing. When the deputies opened the back door of one vehicle, they discovered 1,909 pounds of marijuana worth between $2,000,000 and $6,000,000. The vehicles contained walkie-talkies set to the same channel; one vehicle also contained a semi-automatic firearm.

Subsequently, the San Luis Obispo grand jury indicted Espinoza, Gonzalez, and 12 others, charging various drug crimes arising from the traffic stop and contraband discovery. On July 1, 2013, Espinoza filed a motion to suppress evidence of the marijuana and other items seized, asserting that his detention was unconstitutional. (§ 1538.5.) Gonzalez joined the motion.

On July 25, 2013, the trial court held a suppression hearing, during which Detectives Giese and Nicholas Fontecchio testified.

Giese testified that he is a longtime narcotics detective who has worked with the United States Customs Service regarding marijuana smuggling along the California coastline. He stated that in 2008 the San Luis Obispo County coastline became a target for marijuana smuggling. Giese described training that he received from the Drug Enforcement Administration and Department of Homeland Security regarding smugglers' use of wooden panga boats, favored for their deep hulls and open bows that allow a low profile on the water.

In April 2013, Giese received information from the Santa Barbara County Sheriff's Department that it had recovered marijuana and a GPS unit from a panga boat. The GPS unit included the Montana de Oro State Park, a rural area with a rugged coastline, as a waypoint. On May 28, 2013, Giese received an anonymous telephone call predicting "possible marine smuggling activity" in the park. In response to the call, Giese established a surveillance team in the Montana de Oro area that evening.

2

Giese and his five-member surveillance team watched the park road and communicated by radio. Traffic in the park was "extremely light" between 10:00 p.m. and 6:00 a.m. At approximately 10:00 p.m., Giese observed a white Chevrolet van with decals advertising kitchen remodeling, and a silver Ford Expedition enter the park. Giese researched the license plate numbers of the vehicles, and learned that the vehicles were registered to Paramount and Compton addresses. In Giese's prior smuggling investigations, the arrestees were from Compton or the Los Angeles area, common recruiting sites for panga boat smugglers in his experience.

Another deputy observed the drivers of the Chevrolet van and Ford Expedition park their vehicles side by side at the trailhead that led to the beach. After a few minutes, the drivers left the park and drove their vehicles to a convenience store. The van driver parked, left the van, and "look[ed] all around and up and down the roadway." The driver of the Ford Expedition left his vehicle and conversed with the van driver. Thereafter, the drivers entered their respective vehicles and drove to nearby motels.

At approximately 2:45 a.m., the driver of the Ford Expedition left the motel, stopped at the convenience market, and then entered Montana de Oro State Park. Five to ten minutes later, he left the park and returned to the motel.

At approximately 5:05 a.m., the Chevrolet van, followed closely by a gray Chevrolet pickup truck, entered Montana de Oro State Park. Within four minutes, the Ford Expedition, followed by a white Ford pickup truck, approached the entrance of the park. The Chevrolet van then left the park and drove into a residential neighborhood where the driver "appeared to be watching traffic." The Ford Expedition entered and then left the park, stopped next to the Chevrolet van, and then returned to the park.

At 5:43 a.m., Giese contacted the United States Coast Guard and requested that it inspect the Montana de Oro coastline for a panga boat. Approximately 35 minutes later, Coast Guard Chief Corey Wadley informed Giese that a panga boat was beached in the area of the beach trail.

3

Shortly thereafter, the Chevrolet van and the Ford Expedition entered the park; within four minutes, the Ford and Chevrolet pickup trucks did as well. Less than five minutes later, the Chevrolet van left the park "at a pretty high rate of speed." At subsequent 30-second to one-minute intervals, the Chevrolet pickup truck, Expedition, and Ford pickup truck left the park at normal speeds. Other than the four vehicles, Giese did not observe any traffic driving into or leaving Montana de Oro State Park early that morning.

Fontecchio testified that in the early morning hours, he observed the white pickup truck drive slowly through residential neighborhoods and the driver look around. Fontecchio concluded that the driver was acting as a lookout for law enforcement.

Giese instructed members of his surveillance team to stop and detain the Chevrolet van, driven by Espinoza, and the other three vehicles. Fontecchio saw that the pants and shoes of the eight occupants of the Chevrolet pickup truck, including Gonzalez, were wet and sandy. Deputy Allen Barger detained the van and found substantial quantities of packaged marijuana inside. The deputies seized the marijuana, radios tuned to the same channel, and a firearm.

The trial court denied the motions to suppress evidence.

Thereafter, Espinoza waived his constitutional rights and pleaded nolo contendere to transportation of marijuana. (Health & Saf. Code, § 11360, subd. (a).) Pursuant to a negotiated disposition, the trial court sentenced him to a four-year term to be served in county jail. The court also imposed a $400 restitution fine and awarded Espinoza 124 days of presentence custody credit. (§ 1202.4, subd. (b).)

Gonzalez waived his constitutional rights and pleaded nolo contendere to conspiracy to transport marijuana. (§ 182; Health & Saf. Code, § 11360, subd. (a).) He also admitted that he committed an overt act of offloading marijuana from the panga boat. Pursuant to a negotiated disposition, the trial court sentenced Gonzalez to a two-year term to be served in county jail. The court also imposed a $400 restitution fine and awarded Gonzalez 124 days of presentence custody credit. (§ 1202.4, subd. (b).)

4

Espinoza and Gonzalez appeal and contend that the trial court erred by denying the motion to suppress evidence.

*DISCUSSION*

Espinoza and Gonzalez argue that the deputies did not have reasonable suspicion to detain them or probable cause to search the vehicles. They point out that the anonymous tip provided little detail and gave no time frame, the license plate registration was in a large geographical area (Los Angeles), the surveillance team did not observe what the vehicles and their occupants did inside the park, and the Coast Guard did not indicate how long the panga boat had been beached at Montana de Oro or whether the boat was a fishing boat or used to smuggle marijuana.

Gonzalez also points to distinctions between the Chevrolet pickup truck in which he was a passenger and the other three vehicles detained, e.g., the Chevrolet pickup truck did not follow the other three vehicles closely, did not consistently travel with them, and its passengers did not interact or coordinate with the occupants of the other vehicles.

Espinoza asserts that the testimony of Deputy Barger, the deputy who detained him, was necessary to establish probable cause to search.

The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Navarette v. California* (2014) – U.S. -, - [134 S.Ct. 1683, 1687]; *People v. Suff* (2014) 58 Cal.4th 1013, 1053-1054.) A detention is reasonable pursuant to the Fourth Amendment when the detaining officer can point to specific articulable facts that, in light of the totality of circumstances, provide some objective manifestation that the person detained may be involved in criminal activity. (*Navarette*, at p. 1687; *Suff*, at pp. 1053-1054.) Ordinary traffic stops are investigatory detentions for which law enforcement officers must articulate specific facts justifying the suspicion that a crime is being committed. (*Suff*, at p. 1054; *In re Raymond C.* (2008) 45 Cal.4th 303, 307.)

A reasonable suspicion of criminal activity requires less information to detain than a finding of probable cause to arrest a person. (*Navarette v. California*,

5

*supra*, - U.S. -, - [134 S.Ct. 1683, 1687]; *People v. Wells* (2006) 38 Cal.4th 1078, 1083; *People v. Brown* (2014) 226 Cal.App.4th 142, 147.) "[T]he level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." (*Navarette*, at p. 1687.) Law enforcement may base a finding of reasonable suspicion on its observations, together with information from other sources, including an anonymous tip. (*Wells*, at p. 1083; *Brown*, at p. 147.) "The standard takes into account 'the totality of the circumstances—the whole picture.'" (*Navarette*, at p. 1687.) This standard necessarily precludes a "divide-and-conquer" analysis. (*U.S. v. Arvizu* (2002) 534 U.S. 266, 274.)

In reviewing the trial court's ruling on a suppression motion, we defer to the court's express and implied factual findings that are supported by substantial evidence. (*People v. Suff*, *supra*, 58 Cal.4th 1013, 1053; *People v. Brown*, *supra*, 226 Cal.App.4th 142, 146.) To determine whether the search or seizure is reasonable pursuant to the Fourth Amendment, we exercise our independent judgment. (*Ibid.*)

Giese's reasonable suspicion that Espinoza, Gonzalez, and the other codefendants were involved in the smuggling of marijuana from a panga boat is supported by a totality of circumstances. (*People v. Suff*, *supra*, 58 Cal.4th 1013, 1054 [the law requires only that the traffic stop not be objectively unreasonable under the circumstances].) Giese, an experienced narcotics detective who had investigated marine smuggling along the California coastline, knew that Montana de Oro beach had been indicated on a GPS as a smugglers' waypoint. On the day of the crimes, he received an anonymous tip suggesting that marijuana would be offloaded from a panga boat at Montana de Oro beach. Between 10:00 p.m. that evening and 6:00 a.m. the following morning, the four vehicles entered and left the park numerous times. Several of the vehicle drivers appeared to engage in counterintelligence by driving and looking around residential neighborhoods. The park had little or no traffic during that time.

The Chevy van and the Ford Expedition were registered to Los Angeles addresses, an area known to Giese for recruitment of marine smugglers. The van could carry large amounts of cargo and was marked as a kitchen remodeling business.

6

The Coast Guard also provided information to Giese that a panga boat was beached at Montana de Oro beach. Following Giese's receipt of that information, the van left the park at a high rate of speed, followed closely by the other three vehicles.

In sum, the trial court properly found that the deputies were aware of specific articulable facts, when viewed in their totality, supported a reasonable suspicion that the occupants of the four vehicles might be involved in marijuana smuggling. (*U.S. v. Arvizu*, *supra*, 534 U.S. 266, 274 [totality of circumstances standard precludes consideration and rejection of factors in isolation].) Moreover, "reasonable suspicion 'need not rule out the possibility of innocent conduct.'" (*Navarette v. California*, *supra*, - U.S. -, - [134 S.Ct. 1683, 1691].) Indeed, the purpose of a traffic stop is to allow the officer to investigate and resolve the ambiguity. (*People v. Saunders* (2006) 38 Cal.4th 1129, 1136.)

The deputies also had probable cause to search the vehicles when, after stopping them, they saw the occupants had wet, sandy clothing and shoes. (*California v. Acevedo* (1991) 500 U.S. 565, 580 [police may search automobile if they have probable cause to believe it contains contraband].) The collective knowledge of Giese and his surveillance team informed the reasonable suspicion to detain and probable cause to search. (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555.)

The judgments are affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

7

Ginger E. Garrett, Judge

Superior Court County of San Luis Obispo

_____

Grey May, under appointment by the Court of Appeal, for Defendant and Appellant Jesus Antonio Lomero Gonzalez.

Linda L. Currey, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Felipe Espinoza.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Chung L. Mar, Deputy Attorney General, for Plaintiff and Respondent.