*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

MARK OWEN ANDERSON,

        Defendant-Appellee.

FOR PUBLICATION
February 25, 2026
1:24 PM

No. 375876
Tuscola Circuit Court
LC No. 24-016610-FH

Before: CAMERON, P.J., and M. J. KELLY and YOUNG, JJ.

CAMERON, P.J. (*concurring in part and dissenting in part*)

In this case involving a charge of operating a vehicle while intoxicated, third offense, the trial court suppressed evidence obtained from defendant's traffic stop, including his blood alcohol test results of 0.12, because it determined the police officer lacked reasonable suspicion of drunk driving. I believe that the trial court erred for two reasons. First, I agree with the majority that the trial court erroneously concluded the information the 911 caller provided in her call was "unreliable" and was inadequate to justify the traffic stop because the call possessed sufficient indicia of reliability. Second, the trial court misconstrued Fourth Amendment precedent as requiring law enforcement to independently verify a citizen's report of a crime before making an investigative stop. But I write separately because I disagree with the majority's opinion that the Fourth Amendment requires drunk driving suspects to exhibit physical signs of intoxication before law enforcement can make an investigatory stop for drunk driving. I therefore concur, in part, and dissent, in part.

## I. RELIABILITY

The first question is whether the 911 caller's report was sufficiently reliable for police to credit her allegations. As the majority points out, the trial court applied the wrong law to irrelevant evidence to ultimately find the 911 caller's report unreliable. For the reasons explained by the majority, the 911 call to police provided ample indica of its reliability.

Before the addressing my disagreement regarding reasonable suspicion, I note that the majority and I have slightly different views regarding the purpose of our Fourth-Amendment reliability analysis. The majority opines that, when a citizen's drunk-driving report possesses

-1-

sufficient indicia of reliability, the citizen is to be considered a reliable person. But we are not trying to discern the reliability of a particular person. Rather, the first step in the analysis is to determine whether the 911 call provided sufficient indicia of reliability to credit the *substance* of the report. See *Navarettte v California*, 572 US 393, 397-398; 134 S Ct 1683; 188 L Ed 2d 680 (2014). If the 911 caller's report lacked sufficient indica of reliability, it "would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Adams v William*, 407 US 143, 147; 92 S Ct 1921; 32 L Ed 2d 612 (1972). Here, we have determined that the 911 caller's report conveyed sufficient indicia of its reliability, which means that the officer was entitled to credit her account—not her as a person—and treat her factual allegations as true. See, e.g., *Navarette*, 572 US at 398-399 (concluding the call reporting being run off the road "bore adequate indicia of reliability for the officer to credit the caller's account[]" and that "[t]he officer was therefore justified in proceeding from the premise that the truck had, in fact, caused the caller's car to be dangerously diverted from the highway.").

## II. REASONABLE SUSPICION

This leads to the second step of our Fourth-Amendment analysis: whether the reliable information provided by the 911 caller was sufficient to justify the stop. "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that criminal activity may be afoot." *Id*. at 401 (quotation marks and citation omitted). Thus, the officer was justified to stop defendant if the 911 call created reasonable suspicion that defendant was drunk driving. The officer was entitled to credit as true the following information from the call:

1. That she had personally observed defendant and his friend "drink at least six beers" and noted that they were "getting ready to leave" on their motorcycles;

2. That she had personal contact with the men about their drinking, having asked them "multiple times not to drink at the fairgrounds and they disregarded what [she] said[;]"

3. That she had trash containing defendant's and his friend's empty beer cans, and opined they "probably still [had] beer in their coolers on their bikes, too[;]" and

4. That, based on these observations, she concluded they were "intoxicated," and later reiterated "they are drunk."

Despite this overwhelming evidence from an established reliable report, the majority nonetheless concludes that 911 call falls short of justifying an investigatory stop because it did not report any physical manifestations of drunkenness or drunk driving.[1] The majority insists that reasonable suspicion requires more evidence than what the 911 caller provided, because "drinking alcohol and then driving a vehicle is not a crime in and of itself[.]" Instead, the 911 caller had to report something more; either bad driving or physical evidence of drunkenness before the driver gets behind the wheel. See, e.g., *Navarette*, 572 US at 395 (ran caller off the road); *People v Anderson*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 369614); slip op at 2 (bloodshot

---

[1] This is despite the fact that appellate defense counsel conceded at oral argument before this Court that the 911 caller's report provided reasonable suspicion to effectuate the stop in this case.

eyes and slurred speech); *People v Dacus*, 559 P3d 198 (Colo, 2024) (erratic driving and crossing traffic lines); *State v Scholl*, 2004 SD 85; 684 NW2d 82 (SD, 2004) ("stumbling pretty badly"). Because the 911 call did not describe bad driving or stereotypical drunken behavior, the majority characterizes the report as providing nothing more than an unsubstantiated, conclusory allegation of drunk driving. I believe the majority's reasoning fails to consider the totality of the circumstances, raises the bar for reasonable suspicion, and misconstrues constitutional law as requiring outward signs of drunkenness before police are permitted to make a stop for drunk driving. I begin by noting that the majority, by focusing solely on cases in which drunken behavior or bad driving *was* observed, fails to recognize that its holding is out of step with other caselaw across the county upholding stops in the absence of these observations.

For example, in *Missoula v Moore*, 360 Mont 22, 29; 2011 MT 61; 251 P3d 679 (2011), the Montana Supreme Court held that an officer had particularized suspicion to effectuate a traffic stop on the basis of two 911 calls—one from the defendant's friend, and another from her husband. The defendant's friend called 911 after the defendant left her home, having arrived smelling of alcohol, "leading [the friend] to believe [the defendant] was intoxicated." *Id*. at 23. The friend, in the 911 call, reported that "she just had a friend of hers jump in a vehicle, very upset and she's had a lot to drink." *Id*. (brackets omitted). The friend provided "her full name, address, and telephone number[,]" and also informed dispatch that the defendant was "driving a red Blazer and was heading toward Reserve Street[.]" *Id*. The defendant's husband, who was following the defendant in his own car, also called 911. *Id*. He "provided a description of her vehicle and the direction she was heading[,]" and "informed dispatch that [the defendant] had told him she had consumed one beer earlier, but he did not know if 'it's one beer or six beers or thirty-seven beers.' " *Id*. The defendant's husband even noted that she "was not driving badly," but he was still concerned about others getting hurt. *Id*. As the Montana Supreme Court noted, these two informants "provided information based on their personal observations[]" of the defendant that was sufficient to warrant a stop. *Id*. at 28-29.

The Minnesota Court of Appeals upheld a stop on the basis of even less information provided by an identified informant. In *Payle v Comm'r of Pub Safety*, 439 NW2d 747, 748 (Minn App, 1989), a Burger King employee reported "a drunk driver" and described the color and make of the respondent's car. A subsequent report "indicated that the [car] was leaving the drive-through window." *Id*. A police officer stopped the individual on the basis of these reports, and the respondent's license was revoked. *Id*. Particularly relevant to this case, the trial court in *Payle* had "ruled that the officer did not have articulable grounds to stop [the] respondent because he had no information as to the basis for the informant's conclusion [the] respondent was intoxicated, and he observed no illegal driving conduct." *Id*. The Minnesota Court of Appeals held the trial court's ruling was incorrect, because the informant was an employee who personally observed the respondent, which provided the officer with "reason to believe the informant based his conclusion on personal observations." *Id*. at 748-749. The Court concluded that "[a] layperson is qualified to give an opinion as to whether a person is under the influence, based upon [the] observations of that person." *Id*. at 749.

*Moore* and *Payle* are not outliers. Other jurisdictions have similarly held that a report from a known informant of a defendant drinking and driving based on their personal observations is sufficient to warrant a stop. See, e.g., *State v Powers*, 275 Wis 2d 456, 460; 2004 WI App 143; 685 NW2d 869 (2004) (drug store clerk reported to 911 that "an intoxicated man had come in to

make purchases at the store buying beer, a little outfit, and something else[]" and provided a description of the defendant's truck); *Wilson v Idaho Transp Dep't*, 136 Idaho 270, 273-274; 32 P3d 164 (App, 2001) (homeowner called 911, identified herself and the car the defendant was driving, and reported that the defendant "had been drinking and shortly thereafter drove off in his truck" and "had been threatening people and had refused to leave when asked"); *State v Riefenstahl*, 172 Vt 597, 597; 779 A2d 675 (2001) (gas station clerk provided their name and specifics of the defendant's vehicle on 911 call while reporting that the defendant "was possibly intoxicated and driving."); *State v Bolanos*, 58 Conn App 365, 366-367; 753 A2d 943 (2000) (nightclub employee reported "that an intoxicated person had left the establishment" and identified the make, model, and color, as well as the direction, of the defendant's car; officer's stop was valid even though he "noted no irregular operation[]" after following the defendant for a mile); *Peterson v Tipton*, 833 P2d 830, 831-832 (Colo App, 1992) (gas station clerk reported "an intoxicated white male was getting into a white Corsica and was leaving the station right then.").

Turning to Michigan precedent, this case is very different from the anonymous caller's conclusory allegation of intoxication held to be inadequate to establish reasonable suspicion in *People v Pagano*, 507 Mich 26; 967 NW2d 500 (2021). In *Pagano*, an anonymous caller opined that the defendant was intoxicated based on the defendant's behavior of acting obnoxious and yelling at her children in a parking lot. *Id*. at 29-30. Our Supreme Court held that this tip "did not give rise to a reasonable and articulable suspicion that [the] defendant was engaged in a traffic violation, much less criminal activity[,]" because there were "no other details in the record that would otherwise corroborate the tipster's mere assertion that defendant was drunk." *Id*. at 33-34. The defects in *Pagano* are simply not present here. The 911 caller here was not anonymous; she was an identified individual who had observed defendant and his friend consume "at least six beers," had personal contact with them, and, based on these personal observations and interactions, opined that defendant and his friend were drunk when they drove away. Unlike the anonymous caller in *Pagano*, the 911 caller in this case conveyed timely, reliable, firsthand support for her opinion that defendant was drunk.

The absence of Michigan case law has led the majority to create a new, bright-line rule that requires physical signs of intoxication before police are permitted to conduct an investigative stop. In doing so, the majority draws an unnecessarily sharp line between types of evidence that runs contrary to the case-by-case, totality-of-the-circumstances review specifically delineated by *Terry v Ohio*, 392 US 1, 18-20; 88 S Ct 1868; 20 L Ed 2d 889 (1968), almost 60 years ago.

I also note that the majority's reliance on the fact that "drinking alcohol and then driving a vehicle is not a crime in and of itself; thus, observing two men consume beer [and driving away], without more, is not an observation of criminal behavior or behavior by which one can infer criminality[,]" is also misplaced. It is certainly possible that the 911 caller in this case could have misidentified defendant's drinking and driving as drunk driving. But the fact that there was a *possibility* that defendant was not drunk driving as is recognized by law—that is, with a blood alcohol content below 0.08—does not outweigh the 911 caller's eyewitness report that he was, on the basis of her personal observations and interactions, driving drunk. Indeed, *Navarette* itself

recognized this distinction, noting that "reasonable suspicion need not rule out the possibility of innocent conduct." *Id*. at 403 (quotation marks and citation omitted).[2]

Finally, the majority concludes by noting that the arresting officer followed defendant for five minutes without observing bad driving. While a jury may give this fact weight, it is legally irrelevant for our analysis. Defendant was charged with operating a vehicle while intoxicated, third offense, MCL 257.625(7)(a)(*ii*), under two theories; that defendant was (1) operating a motor vehicle while under the influence of alcohol; and/or (2) had an unlawful blood alcohol level (UBAL) of 0.08 grams or more. Until today, visual impairment for an UBAL charge was irrelevant. Second, as explained in *Navarette*, "the absence of additional suspicious conduct, after the vehicle was first spotted by an officer," does not necessarily "dispel the reasonable suspicion of drunk driving." *Navarette*, 572 US at 403. This makes sense, considering that it is "hardly surprising that the appearance of a marked police car would inspire more careful driving for a time." *Id*. Ironically, *Navarette* also noted that "[e]xtended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication, but the *5-minute period* in this case hardly sufficed in that regard." *Id*. at 404-405 (emphasis added). As in *Navarette*, the five-minute observation period in this case was hardly enough time to dispel the reasonable suspicion of defendant's intoxication in light of the reliable report of drunk driving.

Accordingly, I would reverse.

/s/ Thomas C. Cameron

---

[2] By way of analogy, law enforcement could have conducted an investigative stop-and-frisk of a person at the fairgrounds in this case if police had received a reliable report of an individual carrying a concealed weapon, even though it *could be possible* that the person had a license to carry a firearm, or maybe was not carrying a firearm at all. See, e.g., *People v Tooks*, 403 Mich 568, 579-580; 271 NW2d 503 (1978) (a reliable tip that the defendant had a handgun in public provided police with reasonable suspicion to conduct a stop and frisk). As our Supreme Court explained in *Tooks*, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Id*. at 580-581. Indeed, *Tooks* recognized that an investigative stop-and-frisk in such a situation would be "exactly the type of 'good police work' which is not only acceptable but necessary for the safety of the public." *Id*. at 581.