IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-1113

 Filed: 17 September 2019

Buncombe County, No. 16 CRS 083536

STATE OF NORTH CAROLINA

 v.

TAMMY MARIE NEAL

 Appeal by Defendant from Judgment entered 8 September 2017 by Judge

William H. Coward in Buncombe County Superior Court. Heard in the Court of

Appeals 22 May 2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General John W.
 Congleton, for the State.

 Irons & Irons, PA., by Ben G. Irons II, for defendant-appellant.

 HAMPSON, Judge.

 Factual and Procedural Background

 Tammy Marie Neal (Defendant) appeals from her conviction for Impaired

Driving. The Record tends to show the following:

 On 11 April 2016, Deputy Reggie Ray of the Buncombe County Sheriff’s

Department (Deputy Ray) was dispatched to investigate an anonymous report

concerning a possibly impaired driver. According to Deputy Ray, he received a call

from dispatch that an anonymous individual had observed a “small green vehicle in
 STATE V. NEAL

 Opinion of the Court

color with a tag number of [042-RCW] on [Interstate] 40 that had almost run a few

vehicles off the road . . . [and] that it had ended up in an area known as Sleepy

Hollow[.]” The anonymous tipster also reported that the driver of the green vehicle

had hit a car in the Sleepy Hollow area and was attempting to leave the scene.

 Upon arriving in the Sleepy Hollow area, Deputy Ray observed a car matching

this description and immediately pulled behind the vehicle, while another Deputy

approached the front of the vehicle with his patrol car, to block its path. Deputy Ray

testified that he did not observe the car violate any traffic laws and stopped it based

solely on the report from dispatch. After stopping the car, Deputy Ray observed

Defendant was driving the car.

 When Deputy Ray had Defendant step out of her car, Defendant “was very

unstable on her feet[,]” could not stand or walk well, had to grab her car once for

support, and also had to hold onto Deputy Ray’s vehicle once to avoid falling. Deputy

Ray then placed Defendant in the back of his patrol car with the windows down “for

her safety, because [he] didn’t want her to fall[.]” While another Deputy stayed with

Defendant, Deputy Ray began looking for and eventually found the vehicle that

Defendant allegedly hit. The owner of the vehicle, who was a friend of Defendant,

was standing outside and informed Deputy Ray that she did not want to press

charges.

 -2-
 STATE V. NEAL

 Opinion of the Court

 Subsequently, Andrew Depoyster (Trooper Depoyster), a State Trooper with

the North Carolina Highway Patrol, arrived, took over the investigation, and

conducted three standardized field sobriety tests (SFST) on Defendant: the walk-and-

turn test, the one-leg stand test, and the horizontal gaze nystagmus test (HGN test).

Trooper Depoyster testified Defendant “was very uneasy on her feet[; h]ad a hard

time standing still[; u]sed her arms for balance[; h]ad a blank stare[; and w]as using

[his] vehicle for balance after [he] brought her back to [his car] for the standardized

field sobriety testing.” He also stated Defendant’s “pupils were pinpoint, very small.”

Trooper Depoyster testified he had to stop all three SFSTs early because Defendant

could not follow instructions and showed signs of severe impairment. Defendant

admitted she was prescribed and had taken numerous medications, including

Ambien, Oxycodone, Restrio, an unnamed restless leg syndrome medication, and

Clonazepam. When asked if she had smoked marijuana recently, Defendant replied,

“yes.” Based on Defendant’s responses and her performance on these tests, Trooper

Depoyster arrested and charged Defendant with Impaired Driving. Thereafter,

Defendant consented to having her blood drawn for a blood report (Blood Report).

Trooper Depoyster also created a Driving While Impaired Report (DWIR form), which

contained his findings regarding his investigation into Defendant’s Impaired-Driving

arrest.

 -3-
 STATE V. NEAL

 Opinion of the Court

 On 18 August 2017, Defendant was tried in Buncombe County District Court

and found guilty of Impaired Driving. The trial court sentenced Defendant to a 60-

day suspended sentence and placed her on unsupervised probation for 12 months.

Thereafter, Defendant appealed her conviction in District Court to Buncombe County

Superior Court. Prior to trial in Superior Court, Defendant filed, inter alia, a Motion

to Suppress alleging the stop and seizure violated Defendant’s constitutional rights

and seeking to suppress all evidence obtained as a result of the stop. Specifically,

Defendant contended Deputy Ray did not have reasonable suspicion to stop her car.

After a hearing in which Deputy Ray testified, the trial court deferred its ruling on

Defendant’s Motion to Suppress, and the matter proceeded to trial.

 At trial, the State tendered Dawn Sherwood (Sherwood) as an expert witness

in toxicology and forensic analysis. Sherwood testified she works as a certifying

scientist for NMS Labs, which specializes in toxicology, criminalistics, and DNA

analysis, and that she primarily handles blood tests. She also testified that she has

a bachelor’s degree in biology, approximately 19 years of experience in analyzing

blood work, and completed a graduate course in forensic toxicology that discussed

various drug classifications. Sherwood stated the Blood Report, which she prepared

in her capacity at NMS Labs, showed Defendant’s blood contained measurable

amounts of the following—Oxazepam, which is a benzodiazepine drug used to treat

conditions such as anxiety; Temazepam, another benzodiazepine; Clonazepam,

 -4-
 STATE V. NEAL

 Opinion of the Court

another benzodiazepine; 7-Amino Clonazepam, which is an active metabolite1 of

Clonazepam; Oxycodone Free, an opiate drug commonly used for pain or sedation; 11-

Hydroxy Delta-9 THC, an intermediate metabolite of marijuana; Delta-9 Carboxy

THC, an inactive metabolite of marijuana; and Delta-9 THC, the principle drug in

marijuana.

 The State also tendered Sergeant Ann Fowler (Sgt. Fowler), a drug recognition

expert with the Asheville Police Department, as a drug recognition expert (DRE).

Sgt. Fowler testified that based on her review of the Blood Report and Trooper

Depoyster’s DWIR form, her conversation with Trooper Depoyster, and her training

and experience, she believed Defendant “was impaired on a central nervous system

depressant and also on a narcotic analgesic.”

 At the close of the State’s evidence, Defendant made a Motion to Dismiss based

on insufficient evidence of impairment and her previous Motion to Suppress. The

trial court denied the Motion to Dismiss. On 8 September 2017, the jury found

Defendant guilty of Impaired Driving. The same day, the trial court sentenced

Defendant to a 60-day suspended sentence and placed her on supervised probation

for 12 months. The trial court also entered an Order on Defendant’s Motion to

 1 Sherwood testified that “when a drug is taken into the body, it will be broken down into
different components” called metabolites. According to Sherwood, an “active metabolite” is a substance
that “has an effect on the body.”

 -5-
 STATE V. NEAL

 Opinion of the Court

Suppress (Suppression Order). In its Suppression Order, the trial court made the

following Findings of Fact:

 1. [Deputy Ray], who was employed by the Buncombe County
 Sheriff’s Office at the time of the arrest, was on duty when he
 heard over his dispatch radio that an anonymous person had
 reported by making a cell phone call that a small green Toyota
 automobile, with a tag # of 042-RCW, was being driven
 erratically, and was involved in an accident in the area of the
 Sleepy Hollow Road, and that the driver of the Toyota was
 leaving the scene of the accident.

 2. [Deputy] Ray quickly came upon a small green Toyota
 automobile, with a tag # of 042-RCW, which was leaving a
 parking lot of a townhouse development of off [sic] Sleepy
 Hollow Road.

 3. [Deputy] Ray used his car to block the Toyota from leaving,
 and began his encounter with the Defendant.

Based on these Findings of Fact, the trial court denied Defendant’s Motion to

Suppress.2

 On 8 September 2017, Defendant timely filed a written Notice of Appeal from

this Judgment. Defendant’s Notice of Appeal, however, contains two technical errors.

First, although the caption properly lists Defendant’s name, the body erroneously

 2 The Citation charging Defendant with Impaired Driving also referenced a violation of N.C.
Gen. Stat. § 20-154. Specifically, the Citation alleged Defendant “unlawfully and willfully operat[ed]
a (motor) vehicle . . . by failing to see before turning from a direct line that such movement could be
made in safety.” Although a traffic violation can supply the necessary reasonable suspicion to initiate
a traffic stop, see, e.g., State v. Johnson, 370 N.C. 32, 38, 803 S.E.2d 137, 141 (2017) (citation omitted),
the State did not make this argument at any point during trial or on appeal. In addition, the Citation
was written by Trooper Depoyster who arrived on the scene after Defendant’s vehicle had been stopped.
Further, Deputy Ray testified at trial he did not observe Defendant violate any traffic laws. For these
reasons, we do not address this alleged traffic violation in our reasonable-suspicion analysis.

 -6-
 STATE V. NEAL

 Opinion of the Court

identifies a different person as the party appealing. Second, Defendant’s Notice of

Appeal specifies that Defendant is appealing the “Judgments entered on September

8, 2017,” even though Defendant appeals from a single Judgment. Out of an

abundance of caution, Defendant filed a Petition for Writ of Certiorari with this Court

in order to preserve her right of appellate review. Although we do not believe these

technical errors render her Notice of Appeal defective, “[t]o the extent that [these]

error[s] cast[] any doubt on our jurisdiction, we exercise our discretion and grant

certiorari to review [Defendant’s] claims on their merits[.]” Cox v. Steffes, 161 N.C.

App. 237, 241, 587 S.E.2d 908, 911 (2003) (citation omitted).

 Issues

 The dispositive issues on appeal are: (I) whether (A) Finding of Fact 2 of the

Suppression Order is supported by competent evidence and (B) the trial court

properly concluded Deputy Ray had reasonable suspicion to stop Defendant and (II)

whether (A) the trial court erred by permitting Sgt. Fowler to testify concerning the

impairing effects of certain drugs found in Defendant’s blood and (B) the trial court

erred by finding that Sherwood was an expert in “forensic toxicology” and by allowing

Sherwood to testify that Delta-9 THC was “active” and “having an effect on

[Defendant’s] body.”

 Analysis

 I. Motion to Suppress

 -7-
 STATE V. NEAL

 Opinion of the Court

 “Our review of a trial court’s denial of a motion to suppress is strictly limited

to a determination of whether [the trial court’s] findings are supported by competent

evidence, and in turn, whether the findings support the trial court’s ultimate

conclusion.” State v. Reynolds, 161 N.C. App. 144, 146-47, 587 S.E.2d 456, 458 (2003)

(citation and quotation marks omitted). The trial court’s conclusions of law, however,

are reviewed de novo. See State v. Fernandez, 346 N.C. 1, 11, 484 S.E.2d 350, 357

(1997) (citation omitted). “In reviewing the denial of a motion to suppress, we

examine the evidence introduced at trial in the light most favorable to the State[.]”

State v. Moore, 152 N.C. App. 156, 159, 566 S.E.2d 713, 715 (2002) (citations omitted).

 A. Finding of Fact 2

 Finding of Fact 2 reads: “[Deputy] Ray quickly came upon a small green Toyota

automobile, with a tag # of 042-RCW, which was leaving a parking lot of a townhouse

development of off [sic] Sleepy Hollow Road.” Specifically, Defendant “objects to that

portion of this finding which indicates that Deputy Ray saw the tag #042-RCW on the

car he stopped before he stopped it[.]” Defendant contends Deputy Ray’s testimony,

both at the suppression hearing and trial, establishes that he did not see Defendant’s

license plate number until after stopping Defendant.

 During the suppression hearing, when first asked to describe his initial contact

with Defendant’s vehicle, Deputy Ray stated:

 When we got there, we noticed -- one of us came in from James
 Branch -- Jim’s Branch Road. The other one came in from -- I

 -8-
 STATE V. NEAL

 Opinion of the Court

 think it was the access road. So we came in two different
 directions. We saw the vehicle in question. I pulled in front, and
 an officer pulled in the back, and we blocked her in, because they
 were -- the vehicle was trying to leave. Once I got out of the
 vehicle and got to the front of the suspect vehicle to the driver’s
 side, I noticed [Defendant]. (emphasis added).

At another point during the hearing, Deputy Ray testified, “When I first got there, I

noticed the vehicle in question, the tag number matched, the description matched.”

Later in the hearing, the following exchange occurred:

 [Defense Counsel]: Did you personally view her tag as she was
 driving out?

 [Deputy Ray]: I viewed it as I got into the neighborhood to stop
 her, yes, sir.

 [Defense Counsel]: Were you coming from the front of her or
 behind her?

 [Deputy Ray]: Behind her, sir.

During Defendant’s trial, Deputy Ray described his initial encounter with

Defendant’s vehicle as follows:

 [State]: And what did you do [after you received the call from
 dispatch]?

 [Deputy Ray]: Started en route toward the Sleepy Hollow area.
 When I was coming down -- it’s called Buckeye Access Road. You
 can come down Buckeye Access or a road called Jim’s Branch and
 come in both ways. My partner came in Jim’s Branch. I came in
 the access. When I hit into -- when I came into Sleepy Hollow, I
 noticed a small green vehicle backing out. Hit my blue lights to
 get him to back up, because my partner came in the front, and we
 stopped it.

 -9-
 STATE V. NEAL

 Opinion of the Court

 [State]: And what did you notice as soon as you were able to make
 that stop?

 [Deputy Ray]: The tag number that we were given from
 Communications matched the vehicle that we had just found on
 Sleepy Hollow.

 Thus, during both the suppression hearing and trial, Deputy Ray’s testimony

was inconsistent on whether he pulled in front or behind of Defendant’s vehicle, which

would determine whether he could have viewed Defendant’s license plate on the back

of her vehicle prior to the stop. Nevertheless, “[w]here the evidence is conflicting . . .

, the judge must resolve the conflict. He sees the witnesses, observes their demeanor

as they testify and by reason of his more favorable position, he is given the

responsibility of discovering the truth.” State v. Smith, 278 N.C. 36, 41, 178 S.E.2d

597, 601 (1971). “Furthermore, a trial court’s resolution of a conflict in the evidence

will not be disturbed on appeal[.]” State v. Steen, 352 N.C. 227, 237, 536 S.E.2d 1, 7

(2000) (citation omitted). Therefore, we conclude Finding of Fact 2 is supported by

competent evidence and thus binding on appeal. See id. (citation omitted).

 B. Investigatory Stop

 Defendant next argues Deputy Ray did not have reasonable suspicion to stop

Defendant and therefore the trial court erred by failing to grant Defendant’s Motion

to Suppress. After a thorough review of the relevant case law and the evidence in

this case, we disagree.

 - 10 -
 STATE V. NEAL

 Opinion of the Court

 The Fourth Amendment of the United States Constitution ensures the right of

the people to be secure in their persons and protects citizens from unreasonable

searches and seizures. U.S. Const. amend. IV.; see also N.C. Const. art. I, § 20; State

v. Garner, 331 N.C. 491, 506-07, 417 S.E.2d 502, 510 (1992) (citations omitted). These

protections apply to “seizures of the person, including brief investigatory detentions

such as those involved in the stopping of a vehicle.” State v. Watkins, 337 N.C. 437,

441, 446 S.E.2d 67, 69-70 (1994) (citation omitted).

 “An investigatory stop must be justified by ‘a reasonable suspicion, based on

objective facts, that the individual is involved in criminal activity.’ ” Id. at 441, 446

S.E.2d at 70 (quoting Brown v. Texas, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 362 (1979)).

“[R]easonable suspicion” requires “[t]he stop . . . be based on specific and articulable

facts, as well as the rational inferences from those facts, as viewed through the eyes

of a reasonable, cautious officer, guided by his experience and training.” Id. (citations

omitted). All that is required is a “minimal level of objective justification, something

more than an ‘unparticularized suspicion or hunch.’ ” Id. at 442, 446 S.E.2d at 70

(quoting United States v. Sokolow, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989)). In

assessing whether reasonable suspicion exists, the reasonableness “must be

measured by what the officers knew before they conducted their search.” Florida v.

J.L., 529 U.S. 266, 271, 146 L. Ed. 2d 254, 260 (2000) (emphasis added). A court must

consider the totality of the circumstances in determining whether reasonable

 - 11 -
 STATE V. NEAL

 Opinion of the Court

suspicion to make an investigatory stop existed. Watkins, 337 N.C. at 441, 446 S.E.2d

at 70 (citation omitted).

 The United States Supreme Court has explained the following regarding

anonymous tipsters:

 Of course, an anonymous tip alone seldom demonstrates the
 informant’s basis of knowledge or veracity. That is because
 ordinary citizens generally do not provide extensive recitations of
 the basis of their everyday observations, and an anonymous
 tipster’s veracity is by hypothesis largely unknown, and
 unknowable. But under appropriate circumstances, an
 anonymous tip can demonstrate sufficient indicia of reliability to
 provide reasonable suspicion to make an investigatory stop.

Navarette v. California, 572 U.S. 393, 397, 188 L. Ed. 2d 680, 686 (2014) (alteration,

citations, and quotation marks omitted). In North Carolina, it is well established

that “[a]n anonymous tip can provide reasonable suspicion as long as it exhibits

sufficient indicia of reliability.” State v. Hughes, 353 N.C. 200, 207, 539 S.E.2d 625,

630 (2000) (citations omitted). Further, our Supreme Court has also recognized “[an

anonymous] tip that is somewhat lacking in reliability may still provide a basis for

reasonable suspicion if it is buttressed by sufficient police corroboration.” Id. (citation

omitted). “In sum, to provide the justification for a warrantless stop, an anonymous

tip must have sufficient indicia of reliability, and if it does not, then there must be

sufficient police corroboration of the tip before the stop may be made.” State v. Peele,

196 N.C. App. 668, 672, 675 S.E.2d 682, 685 (2009) (citation and quotation marks

omitted).

 - 12 -
 STATE V. NEAL

 Opinion of the Court

 Here, the tip provided to Deputy Ray through dispatch constituted an

anonymous tip. During the suppression hearing, Deputy Ray testified he did not

know who placed the call to communications and that the anonymous tipster was not

present at the scene of the stop when he arrived. Further, the State in its brief

assumes the caller was anonymous. Therefore, in order to justify an investigatory

stop, the tip must have possessed sufficient indicia of reliability or been corroborated

by Deputy Ray. Id. (citation omitted). Specifically, our case law requires the officer

to corroborate the illegal activity in order to corroborate the anonymous tip. See State

v. Blankenship, 230 N.C. App. 113, 116, 748 S.E.2d 616, 618-19 (2013) (holding that

officers—who immediately stopped the defendant’s vehicle based on it matching an

anonymous tip’s description and without observing the defendant violate any traffic

laws or otherwise drive erratically—had not corroborated the tip’s assertion of

illegality); see also Peele, 196 N.C. App. at 673, 675 S.E.2d at 686 (concluding on

similar facts that officers “did not corroborate the caller’s assertion of careless or

reckless driving”).

 In this case, the State argues Deputy Ray was able to “corroborate significant

portions” of the tip prior to the stop because he observed a car matching the tipster’s

description leaving the same location the tipster alleged it would be leaving. Deputy

Ray, however, testified he did not observe Defendant violate any traffic laws or drive

erratically and that he stopped Defendant based solely on the anonymous tip.

 - 13 -
 STATE V. NEAL

 Opinion of the Court

Therefore, Deputy Ray did not corroborate the tip, and “the only issue to determine

is whether [the anonymous caller’s] tip exhibited sufficient ‘indicia of reliability’ to

provide [Deputy Ray] with reasonable suspicion to stop [D]efendant.” Blankenship,

230 N.C. App. at 116, 748 S.E.2d at 619.

 The State contends the anonymous tip had sufficient indicia of reliability to

support the stop because the caller described Defendant’s vehicle, her erratic driving,

and the location where Defendant was allegedly involved in an accident. In support

of its position, the State puts forth the United States Supreme Court’s decision in

Navarette. We ultimately conclude the anonymous tip in this case had sufficient

indicia of reliability to provide reasonable suspicion supporting the stop of Defendant.

However, in light of the State’s argument, we must acknowledge the apparent tension

between our prior case law addressing similar factual scenarios and Navarette.

 For instance, in Blankenship, officers received a “be-on-the-lookout” message

from dispatch. Id. at 114, 748 S.E.2d at 617. A taxicab driver anonymously3 called

911 on his cell phone and reported observing “a red Mustang convertible with a black

soft top . . . driving erratically, running over traffic cones and continuing west on

Patton Avenue.” Id. at 114, 748 S.E.2d at 617. The caller followed the Mustang and

provided the license plate, “XXT-9756.” Id. Less than two minutes after dispatch

 3
 Using the 911 system, the 911 operator was later able to identify the taxicab driver’s identity;
however, this Court analyzed this case under our anonymous-tip framework because the officers did
not know the taxicab driver’s identity at the time of the stop. Id. at 116, 748 S.E.2d at 618.

 - 14 -
 STATE V. NEAL

 Opinion of the Court

broadcast this call, officers spotted a red Mustang with a black soft top and an “X” in

the license plate heading west on Patton Avenue. Id. When the officers caught up to

the car, it had turned and was approaching a security gate. Id. As the driver

attempted to open the gate, the officers activated their blue lights and stopped the

defendant. Id. At the time of the stop, the officers had not observed the defendant

“violating any traffic laws or see[n] any evidence of improper driving that would

suggest impairment[.]” Id. Thereafter, the officers detected a strong odor of alcohol

and eventually arrested the defendant on suspicion of impaired driving. Id. The

defendant filed a motion to suppress claiming the officers did not have reasonable

suspicion to stop his car, which motion the trial court denied. Thereafter, the

defendant pleaded guilty to impaired driving, reserving his right to seek appellate

review of the denial of his motion to suppress. Id. at 115, 748 S.E.2d at 618.

 On appeal, this Court reversed the trial court’s denial of his motion to suppress.

The Blankenship Court first noted the officers did not corroborate the tip, as “they

did not observe [the defendant] violating any traffic laws[.]” Id. at 116, 748 S.E.2d at

619. Our Court next indicated that the tip itself did not provide enough indicia of

reliability to give the officers reasonable suspicion to stop the defendant because the

caller “was unable to describe the defendant . . . or indicate whether the driver was a

male or a female” and because “a tipster’s confirmation that a defendant was heading

in a general direction is simply not enough detail in an anonymous tip situation.” Id.

 - 15 -
 STATE V. NEAL

 Opinion of the Court

at 117, 748 S.E.2d at 619 (citations and quotation marks omitted). Without more

detail or any corroboration, our Court held on these facts the officers lacked

reasonable suspicion to stop the defendant. Id. at 118, 748 S.E.2d at 620 (citation

omitted).

 Our Court’s analysis in Blankenship comports with a number of decisions from

this Court reaching the same conclusion on similar facts—where an anonymous tip

reports, without more, the location and description of a vehicle alleged to be involved

in criminal activity and officers stop the vehicle based solely on the tip, the officers

lacked the requisite reasonable suspicion to effectuate a stop. See State v. Coleman,

228 N.C. App. 76, 82, 743 S.E.2d 62, 67 (2013) (holding a tip from an individual who

was unknown to officers at the time of the stop to the effect that a cup of beer was

located in a specific vehicle bearing a specific license plate parked at a specific location

did not establish the necessary reasonable suspicion to support an investigative

detention); State v. Johnson, 204 N.C. App. 259, 264-65, 693 S.E.2d 711, 715-16 (2010)

(holding an anonymous tip that “a black male suspect wearing a white shirt in a blue

Mitsubishi with a certain license plate number” was “selling drugs and guns at the

intersection of Pitt and Birch Streets” did not establish the necessary reasonable

suspicion to justify an investigative detention); Peele, 196 N.C. App. at 674-75, 675

S.E.2d at 687 (holding an anonymous tip describing a specific make and color of a car,

the erratic driving of the car, and a description of the direction the car was traveling,

 - 16 -
 STATE V. NEAL

 Opinion of the Court

without further corroboration, did not rise to the level of reasonable suspicion to

lawfully stop the vehicle); State v. McArn, 159 N.C. App. 209, 214, 582 S.E.2d 371,

375 (2003) (holding an anonymous tip reporting that a white Nissan on a specific

street corner was involved in a drug deal did not provide reasonable suspicion for the

stop because, inter alia, the tipster “in no way predicted [the] defendant’s actions . . .

[and] police were thus unable to test the tipster’s knowledge or credibility”).

 However, in 2014, the United States Supreme Court decided Navarette, which

arguably reaches a different result despite similar facts. In Navarette, an anonymous

tipster4 called into the 911 system to report a possible drunk driver, which the police

department’s 911 system recorded as follows: “Showing southbound Highway 1 at

mile marker 88, Silver Ford 150 pickup. Plate of 8-David-94925. Ran the reporting

party off the roadway and was last seen approximately five [minutes] ago.” Id. at

395, 188 L. Ed. 2d at 685 (alteration in original) (citation and quotation marks

omitted). Exactly 13 minutes after this report, an officer heading northbound on

 4 The Supreme Court treated the tipster as an anonymous tipster; however, in footnote one,
the majority acknowledged:

 the reporting party identified herself by name in the 911 call recording.
 Because neither the caller nor the . . . dispatcher who received the call was
 present at the hearing, however, the prosecution did not introduce the
 recording into evidence. The prosecution proceeded to treat the tip as
 anonymous, and the lower courts followed suit.

Navarette, 572 U.S. at 396 n.1, 188 L. Ed. 2d at 685 n.1 (citation omitted). Although the Court claims
to treat this caller as anonymous, it appears the fact that the caller identified herself to the 911
operator influenced the Court’s analysis, as the majority references footnote one twice in its opinion.
See id. at 398, 400, 188 L. Ed. 2d at 687, 688.

 - 17 -
 STATE V. NEAL

 Opinion of the Court

Highway 1 passed the truck near mile marker 69. After making a U-turn, the officer

followed the defendant for a 5-minute period but did not observe any signs of impaired

driving. Thereafter, the officer stopped the defendant, smelled marijuana emanating

from the vehicle, and eventually arrested the defendant. Id. at 395-96, 188 L. Ed. 2d

at 685.

 The United States Supreme Court held the anonymous call “bore adequate

indicia of reliability for the officer to credit the caller’s account” and that this “indicia

of reliability . . . [was] sufficient to provide the officer with reasonable suspicion that

the driver of the reported vehicle had run another vehicle off the road[, which] made

it reasonable under the circumstances for the officer to execute a traffic stop.” Id. at

398, 404, 188 L. Ed. 2d at 687, 691. Although it acknowledged this was a “close

case[,]” a divided Supreme Court nonetheless upheld the stop primarily based on

what it observed to be three indicia of reliability. Id. at 404, 188 L. Ed. 2d at 691

(citation omitted).

 First, the Court concluded that because the caller reported being run off the

road by a specific vehicle, “the caller necessarily claimed eyewitness knowledge of the

alleged dangerous driving.” Id. at 399, 188 L. Ed. 2d at 687. Second, the Court

asserted the caller was credible based on the specific timeline of events. As the Court

explained:

 Police confirmed the truck’s location near mile marker 69
 (roughly 19 highway miles south of the location reported in the

 - 18 -
 STATE V. NEAL

 Opinion of the Court

 911 call) at 4:00 p.m. (roughly 18 minutes after the 911 call). That
 timeline of events suggests that the caller reported the incident
 soon after she was run off the road. That sort of contemporaneous
 report has long been treated as especially reliable.

Id. at 399, 188 L. Ed. 2d at 688. Lastly, the Supreme Court found it significant that

the caller used the 911 emergency system because this prevents the likelihood of

someone making false reports, as the call can be traced and the caller subject to

prosecution. Id. at 400-01, 188 L. Ed. 2d at 688-89 (citations omitted). Relying on

these three indicia, the Supreme Court held the officers had reasonable suspicion to

stop the defendant.5 Id. at 404, 188 L. Ed. 2d at 691.

 Here, though, we need not resolve the apparent tension between our previous

case law and Navarette because the present case presents additional indicia of

 5 Justice Scalia authored a dissenting opinion, joined by Justices Ginsburg, Sotomayor, and
Kagan, raising concerns about the majority opinion and characterizing it as a deviation from past
precedent. Regarding the first indicia of the caller having eyewitness knowledge of the alleged
dangerous driving, the dissent argued: “So what? The issue is not how [the tipster] claimed to know,
but whether what [the tipster] claimed to know was true.” Id. at 407, 188 L. Ed. 2d at 692 (Scalia, J.,
dissenting). To that question, “[t]he claim to ‘eyewitness knowledge’ . . . supports not at all its
veracity[.]” Id. The dissent further disregards the second indicia because the time it would take for
the caller to observe the vehicle, write down the license plate number, and call 911 suggests there was
“no such immediacy” in that case but rather “[p]lenty of time [for the caller] to dissemble or embellish.”
Id. at 408, 188 L. Ed. 2d at 693. As for the 911 system, the dissent posited that the tipster’s use of the
911 system proved “absolutely nothing . . . unless the anonymous caller was aware of [the] fact” that
911 callers can be identified. Id. at 409, 188 L. Ed. 2d at 694. For the dissent, the majority’s opinion

 serves up a freedom-destroying cocktail consisting of two parts patent falsity:
 (1) that anonymous 911 reports of traffic violations are reliable so long as they
 correctly identify a car and its location, and (2) that a single instance of careless
 or reckless driving necessarily supports a reasonable suspicion of drunkenness.

Id. at 413, 188 L. Ed. 2d at 696. From this, the dissent concludes the majority has created a new rule:
“So long as the caller identifies where the car is, anonymous claims of a single instance of possibly
careless or reckless driving, called in to 911, will support a traffic stop.” Id. at 405, 188 L. Ed. 2d at
691.

 - 19 -
 STATE V. NEAL

 Opinion of the Court

reliability not present in those cases. In the case sub judice, the anonymous caller

reported a small green vehicle with a tag number of 042-RCW being driven erratically

on Interstate 40. The caller then indicated the car was now in the Sleepy Hollow

area, where it was involved in an accident near Sleepy Hollow Road, and that the

driver of the car was leaving the scene of the accident. Whereas the anonymous caller

in Navarette claimed a single instance of being run off the road, which was indicative

of impaired driving, the anonymous caller here not only alleged several instances of

erratic driving on Interstate 40 but also reported observing Defendant hit another

vehicle in a specific, different location and attempting to flee the scene.

 Further, Deputy Ray arrived in the Sleepy Hollow area and immediately

noticed a vehicle matching the exact description attempting to leave, which suggests

the anonymous caller reported the accident soon after it occurred. When coupled with

the fact that the anonymous caller alleged not only several instances of erratic driving

but also a potential hit-and-run accident, the anonymous tip “bore adequate indicia

of reliability for [Deputy Ray] to credit the caller’s account”; therefore, this “indicia of

reliability . . . [was] sufficient to provide [Deputy Ray] with reasonable suspicion that

[Defendant had driven erratically, hit another vehicle, and was attempting to flee,

which] made it reasonable under the circumstances for [Deputy Ray] to execute a

traffic stop.” Id. at 398, 404, 188 L. Ed. 2d at 687, 691; see generally Hughes, 353 N.C.

at 207, 539 S.E.2d at 630 (“An anonymous tip can provide reasonable suspicion as

 - 20 -
 STATE V. NEAL

 Opinion of the Court

long as it exhibits sufficient indicia of reliability.” (citations omitted)). Accordingly,

the trial court did not err in denying Defendant’s Motion to Suppress.

 II. Expert Testimony

 A trial court’s ruling regarding the admissibility of expert testimony “will not

be reversed on appeal absent a showing of abuse of discretion.” State v. McGrady,

368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (citation and quotation marks omitted). A

trial court may only be reversed for abuse of discretion “upon a showing that its ruling

was manifestly unsupported by reason and could not have been the result of a

reasoned decision.” Id. (citation and quotation marks omitted).

 A. Sgt. Fowler’s Testimony

 Defendant asserts the trial court erred by allowing Sgt. Fowler to testify

“about the impairing effects of the drugs found in [Defendant’s] blood sample and her

reconstruction and validation of the SFST performed by [Trooper Depoyster].”

 Rule 702 of the North Carolina Rules of Evidence governs testimony by experts

and provides in relevant part:

 (a) If scientific, technical or other specialized knowledge will
 assist the trier of fact to understand the evidence or to determine
 a fact in issue, a witness qualified as an expert by knowledge,
 skill, experience, training or education, may testify thereto in the
 form of an opinion, or otherwise, if all of the following apply:

 (1) The testimony is based upon sufficient facts or data.

 (2) The testimony is the product of reliable principles and
 methods.

 - 21 -
 STATE V. NEAL

 Opinion of the Court

 (3) The witness has applied the principles and methods
 reliably to the facts of the case.

 (a1) Notwithstanding any other provision of law, a witness may
 give expert testimony solely on the issue of impairment and not
 on the issue of specific alcohol concentration level relating to the
 following:

 (1) The results of a Horizontal Gaze Nystagmus (HGN) Test
 when the test is administered in accordance with the
 person’s training by a person who has successfully
 completed training in HGN.

 (2) Whether a person was under the influence of one or more
 impairing substances, and the category of such impairing
 substance or substances, if the witness holds a current
 certification as a Drug Recognition Expert, issued by the
 State Department of Health and Human Services.

N.C. Gen. Stat. § 8C-1, Rule 702(a)-(a1) (2017). “[T]he trial judge is afforded wide

latitude of discretion when making a determination about the admissibility of expert

testimony.” State v. Bullard, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984).

 We initially note Defendant does not challenge the trial court’s determination

that Sgt. Fowler qualifies as a DRE. As to the impairing effects of the substances

found in Defendant’s blood, Sgt. Fowler categorized the various drugs identified in

the Blood Report into three categories: central nervous system depressants, narcotic

analgesics, and cannabis. Based on her training and experience as a DRE, Sgt.

Fowler then described how there are certain effects or symptoms associated with each

category. After talking with Trooper Depoyster and reviewing his DWIR form, Sgt.

 - 22 -
 STATE V. NEAL

 Opinion of the Court

Fowler testified that, in her opinion, Defendant “was impaired on a central nervous

system depressant and also on a narcotic analgesic.” Importantly, Sgt. Fowler

testified that she could not determine whether Defendant was impaired based on the

levels of the various drugs in the Blood Report; rather, she stated that she compares

the signs and symptoms of impairment described in the DWIR form to corroborate

drug categories identified in the Blood Report. Therefore, the trial court did not abuse

its discretion by allowing Sgt. Fowler’s testimony on this point. See id.; see also N.C.

Gen. Stat. § 8C-1, Rule 702(a1)(2) (allowing a qualified DRE to give an opinion as to

whether “a person was under the influence of one or more impairing substances”).

 As for her “reconstruction and validation” of the SFSTs performed by Trooper

Depoyster, Defendant claims Sgt. Fowler’s “evaluation of [Trooper Depoyster’s

SFSTs] was not reliable.” However, we note Rule 702 explicitly allows Trooper

Depoyster to testify to the results of a HGN test because he had “successfully

completed training in HGN.” Id. § 8C-1, Rule 702(a1)(1); see also State v. Fincher,

___ N.C. App. ___, ___, 814 S.E.2d 606, 609-10 (2018). Therefore, Sgt. Fowler’s

testimony on this point, even assuming arguendo it was error, was not prejudicial

because Trooper Depoyster’s testimony was essentially the same and constituted

competent evidence. See State v. Wilkerson, 363 N.C. 382, 415, 683 S.E.2d 174, 194

(2009) (“[E]videntiary error does not necessitate a new trial unless the erroneous

admission was prejudicial.” (citations omitted)).

 - 23 -
 STATE V. NEAL

 Opinion of the Court

 B. Sherwood’s Testimony

 Defendant contends the trial court erred by finding that Sherwood was an

expert in “forensic toxicology” and by allowing Sherwood to testify that Delta-9 THC

was “active” and “having an effect on [Defendant’s] body.”

 However, the trial court “is afforded wide latitude of discretion when making

a determination about the admissibility of expert testimony.” Bullard, 312 N.C. at

140, 322 S.E.2d at 376. Here, Sherwood testified that she has a bachelor’s degree in

biology, approximately 19 years of experience in analyzing blood work, and completed

a graduate course in forensic toxicology that discussed various drug classifications.

Based on this testimony, the trial court did not abuse its discretion by finding

Sherwood was an expert in toxicology and forensic analysis. See id.; see also State v.

Howard, 78 N.C. App. 262, 270, 337 S.E.2d 598, 603 (1985) (“Ordinarily whether a

witness qualifies as an expert is exclusively within the discretion of the trial judge

and is not to be reversed on appeal absent a complete lack of evidence to support his

ruling.” (emphasis added) (citation omitted)).

 As for Defendant’s argument that the trial court erred by allowing Sherwood

to testify that Delta-9 THC was “active” and “having an effect on [Defendant’s]

body[,]” we note Sherwood simply clarified that the term “active” means a substance

“has an effect on the body.” Sherwood, however, did not testify that any of the

substances identified in the Blood Report were, in fact, having an impairing effect on

 - 24 -
 STATE V. NEAL

 Opinion of the Court

Defendant’s body. Specifically, Sherwood testified she could not say affirmatively

whether any of the substances in Defendant’s blood were having an impairing effect

on Defendant or when Defendant had last taken any of these drugs. Therefore, the

trial court did not abuse its discretion by allowing Sherwood’s testimony. See

Bullard, 312 N.C. at 140, 322 S.E.2d at 376.

 C. Prejudice

 Even assuming the trial court erred by allowing Sgt. Fowler’s and Sherwood’s

challenged testimony, we conclude Defendant has failed to meet her burden that the

admission of the evidence was prejudicial in this case. See Wilkerson, 363 N.C. at

415, 683 S.E.2d at 194 (citations omitted); see also State v. Cotton, 329 N.C. 764, 767,

407 S.E.2d 514, 517 (1991) (recognizing the burden of establishing prejudicial error

is on the defendant). To show prejudicial error, a defendant must show that “there is

a reasonable possibility that, had the error in question not been committed, a different

result would have been reached at the trial out of which the appeal arises.” N.C. Gen.

Stat. § 15A-1443(a) (2017) (emphasis added). “The admission of evidence which is

technically inadmissible will be treated as harmless unless prejudice is shown such

that a different result likely would have ensued had the evidence been excluded.”

State v. Gappins, 320 N.C. 64, 68, 357 S.E.2d 654, 657 (1987) (citations omitted); see

also State v. Taylor, 165 N.C. App. 750, 758, 600 S.E.2d 483, 489 (2004) (holding the

erroneous admission of the State’s expert witness’s testimony regarding a retrograde

 - 25 -
 STATE V. NEAL

 Opinion of the Court

extrapolation analysis was not prejudicial where there was other strong evidence of

the defendant’s impairment).

 Here, even excluding testimony of the State’s experts, ample evidence existed

that Defendant was impaired at the time of her arrest. Specifically, the evidence

tended to show as follows: Defendant was reportedly driving erratically on Interstate

40 and subsequently hit a parked car. After being stopped, Defendant “was very

unstable on her feet[,]” could not stand or walk well, and had to support herself

multiple times on multiple vehicles to avoid falling. Both Deputy Ray and Trooper

Depoyster testified that they believed Defendant was impaired. Further, Defendant

could not complete the three SFSTs administered by Trooper Depoyster and showed

multiple indicators suggestive of impairment on all three tests. Defendant also

admitted to taking multiple drugs and smoking marijuana recently, and a blood test

revealed five different types of drugs in her system. As in Taylor, we hold that “even

if the admission of [the State’s experts’] testimony was error, the error was not

prejudicial.” Id. at 758, 600 S.E.2d at 489.

 Conclusion

 Accordingly, for the foregoing reasons, we find no error in Defendant’s trial for

Impaired Driving.

 NO ERROR.

 Judges STROUD and BROOK concur.

 - 26 -