People v Leighton R. (2025 NY Slip Op 06534)

People v Leighton R.

2025 NY Slip Op 06534

Decided on November 25, 2025

Court of Appeals

Cannataro, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2025

No. 87

[*1]The People & c., Respondent,
v
Leighton R., Appellant.

Clara Hammond-Oakley, for appellant.
Nicole Neckles, for respondent.

CANNATARO, J.

The primary issue on this appeal is the standard that must be applied to determine whether police have reasonable suspicion to conduct an automobile stop based upon a contemporaneous report from an anonymous 911 caller that they were the victim of a crime. We hold that whether such a stop is justified should be evaluated under the totality of the circumstances. Moreover, since there was record support for the affirmed finding of both reasonable suspicion for the stop of defendant's vehicle and probable cause to search the locked glove compartment, the Appellate Division order should be affirmed.
On June 7, 2014, an anonymous individual called 911 and reported that "somebody just shot at me" resulting in a wound to his right arm. He gave his location as East 233rd Street and White Plains Road in the Bronx and described the perpetrators as two Black males in a white Mercedes-Benz. The caller also provided the address of one of the perpetrators. In response to further questioning, the caller advised the 911 operator that the perpetrators were people he knew and "ha[d] beef with." He told the 911 operator that his name was "Brian" and stated that he did not know his callback number because it was a new phone. He declined the 911 operator's offers to send an ambulance or police assistance.
The police dispatcher then broadcasted the report of shots fired at East 233rd and White Plains Road. An officer posted at that location immediately responded, "there's no shots fired over here." The dispatcher responded, a [*2]"male caller states he was shot, he was hit in his arm." The dispatcher also provided the description of the alleged shooters and vehicle over the radio. The dispatcher then attempted to call the 911 caller back, but was initially unable to reach the victim. Meanwhile, Officer Bennett Shelley, who was patrolling with his partner in a marked car about four blocks away, headed toward the location of the reported shooting. Within 30 seconds to a minute of the broadcast, Officer Shelley observed a white Mercedes matching the description of the shooter's vehicle and its occupants coming from the direction of the reported shooting. Officer Shelley executed a stop of defendant's vehicle, during which he asked to see defendant's driver's license and inquired as to where defendant was coming from [FN1]. Defendant provided his license and stated that he was coming from a baby shower in Mount Vernon.
During the stop, Officer Shelley asked the dispatcher for the location information for the 911 caller, and she confirmed, based on cell tower location, that the 911 call had been made near the area of East 233rd and White Plains Road. The dispatcher contacted the 911 caller, who again provided the perpetrator's home address, including apartment number, permitting Officer Shelley to verify that the address on defendant's driver's license matched that given by the caller. The caller also advised that the alleged shooting had not taken place in the Bronx, but in Mount Vernon. The caller indicated to the dispatcher that he was going to a local hospital for treatment.
When asked by Officer Shelley if there was anything in the car the officers should know about, defendant responded, "no, you can check the car." During the search, Officer Shelley pulled on the handle of the locked glove compartment and was able to see a handgun and smell gunpowder through a "gap." He then unlocked the glove compartment using defendant's key fob, found a handgun and ammunition, and placed defendant under arrest. The police were never able to locate the 911 caller.
Following a hearing at which Officer Shelley was the sole witness, Supreme Court denied defendant's motion to suppress the gun. The court found that the proximity of defendant's vehicle to the alleged shooting within moments of the 911 call, and the officers' observations corroborating the description of the suspects given by the caller, provided reasonable suspicion to stop the vehicle. The court further concluded that defendant voluntarily consented to the search of the vehicle and that, once the officer was able to see the firearm and smell gun powder, there was probable cause to search the glove compartment under the automobile exception.
Defendant was convicted, upon his guilty plea, of attempted criminal possession of a weapon in the second degree. The Appellate Division affirmed, finding that suppression was properly denied, as the anonymous tip was sufficiently corroborated to provide reasonable suspicion for the vehicle stop and defendant consented to a search of the vehicle, which led to probable cause to open the locked glove compartment (223 AD3d 597, 598 [1st Dept 2024]). A Judge of this Court granted defendant leave to appeal (42 NY3d 928 [2024]).
We have historically been skeptical of authorizing police action on the basis of an anonymous tip. In People v De Bour, we "characterized the use of anonymous information to justify intrusive police action as 'highly dangerous' " and observed that tips from unknown informants "are of the weakest sort since no one can be held accountable if the information is in fact false and there is no way to assure, by way of intangibles such as voice, facial expression or emotional state, that the information was communicated and received accurately and was believable" (40 NY2d 210, 224-225 [1976] [citations omitted]). In recognition of the risks presented by anonymous reports of criminal activity, we have evaluated an anonymous informant's reliability and basis of knowledge under the Aguilar-Spinelli framework (see Aguilar v Texas, 378 US 108 [1964]; Spinelli v United States, 393 US 410 [1969]), to determine whether a tip provides probable cause (see People v Griminger, 71 NY2d 635 [1988]).
Where an informant has not revealed their basis of knowledge, as, for example, by personal observation, "it is not enough that a number, even a large number, of details of noncriminal activity supplied by the informer be confirmed. Probable cause for such an arrest or search will have been demonstrated only when there has been confirmation of sufficient details suggestive of or directly related to the criminal activity informed about to make [*3]reasonable the conclusion that the informer has not simply passed along rumor, or is not involved (whether purposefully or as a dupe) in an effort to 'frame' the person informed against" (People v Elwell, 50 NY2d 231, 234-235 [1980]). By contrast, the reliability prong can be established either by past instances of the individual's reliability or by independent observation of corroborative details by the police that are noncriminal in nature (see 50 NY2d at 237; People v DiFalco, 80 NY2d 693, 698-699 [1993]).
We have continued to apply the principles of Aguilar-Spinelli in the probable cause context, even after the United States Supreme Court abandoned it in favor of the totality-of-the-circumstances approach (see Illinois v Gates, 462 US 213, 233 [1983] [limiting the reliability and basis-of-knowledge prongs of Aguilar-Spinelli to "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations"]), in recognition that Aguilar-Spinelli is more protective of our citizens' rights under the State Constitution (see Griminger, 71 NY2d at 640-641; People v Johnson, 66 NY2d 398, 406-407 [1985]). At issue here, however, is whether that same analysis is required for the lesser intrusion of an investigatory stop requiring reasonable suspicion.
For its part, the Supreme Court in Alabama v White (496 US 325 [1990]) applied the Gates totality-of-the-circumstances test to determine whether an anonymous tip can support a stop based on reasonable suspicion. Our precedent is somewhat more unsettled. For example, in People v Moore, we concluded that "[a]n anonymous tip cannot provide reasonable suspicion to justify a seizure, except where that tip contains predictive information—such as information suggestive of criminal behavior—so that the police can test the reliability of the tip" (6 NY3d 496, 499 [2006], citing Florida v J.L., 529 US 266, 272 [2000]). And in People v William II (98 NY2d 93, 99 [2002]), we held that anonymous tips that provided only "readily observable characteristics" and "lacked predictive information that would permit the police to test the caller's knowledge" were insufficient to establish reasonable suspicion. Those decisions followed the Supreme Court's decision in Florida v J.L., which emphasized the importance of "predictive information" as a means for police to test a tipster's knowledge and credibility (see 529 US at 271). Significantly, neither Moore nor William II referenced Aguilar-Spinelli in determining that the respective tips did not provide reasonable suspicion for the stops.
More recently, in People v Argyris, we held that reasonable suspicion was established by a 911 call from an anonymous individual and the confirmatory observations by the police of information provided by the caller that was noncriminal in nature (24 NY3d 1138, 1140-1141 [2014]). Although there were multiple writings in Argyris, the brief majority opinion in that case holding that the police had reasonable suspicion to stop the defendants' vehicle based on the tip also stated that "the absence of predictive information in the tip was not fatal to its reliability" (see 24 NY3d at 1140-1141, citing Moore, 6 NY3d at 499). On this point, the majority cited to Navarette v California (572 US 393 [2014]), a Supreme Court case decided the same year, in which the Supreme Court appeared to retreat from J.L.'s emphasis on predictive information, at least in the context of 911 calls reporting drunk driving. Navarette held that an anonymous 911 call was sufficiently reliable to justify a traffic stop where the caller reported that another vehicle had run her off the road and provided a description of the vehicle, including its license plate, as well as the vehicle's approximate location and direction of travel (see 572 US 393). The Court reasoned that, by reporting a specific vehicle, "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability" (572 US at 399). As further indicia of reliability, the Court emphasized the report's contemporaneous nature and the 911 system's capacity to identify and locate callers (see 572 US at 400-401).
In our most recent cases addressing whether there was reasonable suspicion to stop a vehicle based on an anonymous tip, we have been presented with fact patterns under which the result would have been the same whether we evaluated the reliability of the anonymous tip under the totality of the circumstances or applied the Aguilar-Spinelli framework (see People v Walls, 37 NY3d 987, 989 [2021]; Argyris, 24 NY3d at 1140-1141)[FN2]. We retreated [*4]somewhat from the requirement of predictive information emphasized in Moore and William II, stating in Argyris that such information was not required "under the[] circumstances" of that case (24 NY3d at 1141). To the extent that there is an open issue as to which test should be applied when assessing reasonable suspicion, as opposed to probable cause (see People v Chase, 85 NY2d 493, 501 [1995]; People v Landy, 59 NY2d 369, 375-377 [1983]; 1 Barry Kamins, New York Search & Seizure § 2.04, n 22 [2025]), we now hold that the appropriate test is whether an anonymous tip is sufficiently reliable to provide reasonable suspicion under the totality of the circumstances. While this approach involves an analysis of the Aguilar-Spinelli reliability and basis of knowledge factors, "allowance must be made in applying them for the lesser showing required" to meet the reasonable suspicion standard (White, 496 US at 328-329).[FN3]
Here, the totality of the circumstances establishes that there was reasonable suspicion to stop defendant's vehicle. The anonymous informant used the 911 system to report that he had "just been shot," necessarily claiming personal knowledge of the crime. The caller also provided a description of the alleged shooter, the make and color of the shooter's vehicle, and his location. The police were able to corroborate that information, within one minute of receiving the dispatch and within a block from the reported location, when they observed a car and suspect matching the description provided. The contemporaneous nature of the report is substantial here and weighs in favor of the caller's veracity.[FN4]
The police were duty-bound to investigate the radio report of a shooting, and they could not ignore their own contemporaneous observation of a vehicle matching the caller's description and location. Nor was the duty to investigate extinguished when another police officer failed to hear gunshots at the reported location (see People v Benjamin, 51 NY2d 267, 270 [1980]). And, although the police learned information that arguably called aspects of the anonymous caller's reliability into question as the investigation continued, our review of the reasonableness of the officer's conduct is limited to the information known to the police at the time of the vehicle stop. Had they been aware that the alleged shooting happened in Mount Vernon prior to making the stop, for instance, the result here might be different. Under the circumstances presented, however, there is record support for the affirmed finding of reasonable suspicion.
Finally, there is record support for the affirmed finding of probable cause to search the glove compartment (see People v McRay, 51 NY2d 594, 601 [1980]). The courts below found that defendant consented to a search of the vehicle by offering to let the officer "check" the car. Even if defendant may not have reasonably expected that his consent extended to the locked glove compartment (see People v Gomez, 5 NY3d 416, 419 [2005]; Florida v Jimeno, 500 US 248, 251-252 [1991]), once the officer observed the gun and smelled gunpowder through a gap in the glove compartment, probable cause was established and the officer could search the locked container under both the Fourth Amendment and the automobile exception to the warrant requirement (see People v Ellis, 62 NY2d 393, 398 [1984]).
Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting):

The majority holds that the police can stop anyone on the road based on an anonymous phone caller's allegation that they committed a crime, simply because the caller described the model and color of the car, and the race and gender of the driver, even when an officer at the scene contradicted the caller's allegations. To the extent the majority hints that the tipster in this appeal provided additional information before the police initiated a car stop (see majority op at 2), it misrepresents the record. Moreover, the majority's suggestion that our state law is unclear as to whether an anonymous tip may provide reasonable suspicion to justify a physical intrusion is contrary to precedent. The Court has previously concluded that an anonymous tip may only provide the police with reasonable suspicion of criminality if it satisfies the two-pronged Aguilar-Spinelli test by providing the informant's basis of knowledge and indicia of the informant's reliability (see People v Argyris, 24 NY3d 1138, 1143-1144 [2014] [Abdus-Salaam and Graffeo, JJ., concurring]; id. at 1182 [Rivera, J., and Lippman, C.J., concurring in part and dissenting in part]). The majority is therefore wrong on the facts and the law. The result is the majority's policy-driven and largely unexplained adoption of the federal totality of the circumstances test (see majority op at 8), the same test this Court has long rejected because it fails to adequately protect New Yorkers from malicious tipsters who act under the guise of anonymity, and from unsubstantiated allegations based on pure rumor (see Argyris, 24 NY3d at 1157-1159 [Abdus-Salaam, J., concurring]; id. at 1168 [Read, J., concurring in part and dissenting in part]; id. at 1182 [Rivera, J., concurring in part and dissenting in part]; see also People v Johnson, 66 NY2d 398, 406-407 [1985] [rejecting the federal totality of the circumstances standard in the probable cause context]).
While an anonymous tip may supply the police with grounds for further investigation, it cannot justify a stop unless it provides adequate indicia of reliability. I would reverse the Appellate Division's order because the anonymous tip here lacked any such indicia.
I.
The events leading to defendant's seizure and arrest are undisputed. At approximately 11:00 pm, two officers on patrol received a radio dispatch indicating that someone called 911 to report that a man was shot at a specific intersection a few blocks from the officers' location. The caller described the perpetrators as two Black men in a white Mercedes Benz. As the officers drove toward the intersection, they received a radio dispatch from another officer, posted at the intersection, reporting "no shots fired over here." When they were approximately one block from the alleged scene, one of the officers saw a white Mercedes Benz occupied by two Black men. The car was not speeding or violating any other rule of the road. Nonetheless, the officers activated their patrol car lights and siren to initiate a car stop. Defendant was driving the Mercedes Benz, and he immediately pulled over in response to the police signal. As I discuss below, under our well-established case law, the anonymous caller's tip did not provide the [*5]officers with reasonable suspicion to stop the car, and Supreme Court should have granted defendant's motion to suppress the contraband that the police subsequently recovered.[FN1]
II.
A vehicular stop is lawful "when [it is] based on a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime" (People v Hinshaw, 35 NY3d 427, 430 [2020]). Unlike the more demanding standard of probable cause, which is required to justify an arrest (People v Moore, 6 NY3d 496, 498-499 [2006]), reasonable suspicion is "that quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v Messano, 41 NY3d 228, 232 [2024], quoting People v Martinez, 80 NY3d 444, 448 [1992]).
Under limited circumstances, an anonymous tip may supply the police with information justifying an arrest or seizure (see e.g. Argyris, 24 NY3d at 1140-1141). However, the Court has warned against overreliance on such tips, explaining that "the use of anonymous information to justify intrusive police action [i]s 'highly dangerous' " (People v De Bour, 40 NY2d 210, 225 [1976], quoting People v Taggart, 20 NY2d 335, 343 [1967]). Indeed, an anonymous tip is inherently suspect, and warrants careful scrutiny, because of the difficulty in confirming information from a source who keeps their identity secret. Such a tip is even more suspect when provided over a telephone, because the police cannot visually assess the caller's credibility. Unsurprisingly, then, "[c]ourts have uniformly held that one of the weakest justifications for a stop of a defendant is a radio transmission based on an anonymous tip" (Barry Kamins, New York Search and Seizure § 2.04 [2] [b] [2025]).
In Argyris, a majority of the Court adopted the two-part test drawn from the United States Supreme Court's decisions in Aguilar v Texas (378 US 108 [1964]) and Spinelli v United States (393 US 410 [1969]) to determine whether, as a matter of state constitutional law, the anonymous tips at issue provided the police with reasonable suspicion to initiate car stops of each defendant (24 NY3d at 1144 [Abdus-Salaam, J., concurring]; id. at 1182 [Rivera, J., concurring in part and dissenting in part]). Under that test, an informant must provide sufficiently detailed information to separately establish both their reliability as an informant, and that they have a reliable basis for their knowledge of the alleged criminal activity (id. at 1150 [Abdus-Salaam, J., concurring]; id. at 1170-1171 [Rivera, J., concurring in part and dissenting in part]). Although the Supreme Court abandoned the Aguilar-Spinelli test in Illinois v Gates (462 US 213 [1983]) in exchange for a totality of the circumstances test, this Court has long continued to apply it in the probable cause context (see Johnson, 66 NY2d at 400).[FN2] Although some members of the Argyris Court reached different conclusions as to whether the anonymous tips at issue were sufficiently reliable to allow the police to initiate the car stops, a majority of the Court concluded that the heightened test applies in the reasonable suspicion context, just as that required for probable cause (see 24 NY3d at 1144 [Abdus-Salaam, J., concurring]; id. at 1182 [Rivera, J., concurring in part and dissenting in part]). Moreover, a majority of the Court concluded that a tip that includes predictive information of criminality supplies reasonable suspicion to justify a stop (see id. at 1160 [Abdus-Salaam, J., concurring]; id. at 1168 [Read, J., concurring in part and dissenting in part]; id. at 1177-1180 [Rivera, J., concurring in part and dissenting in part]).
Notably, this approach provides heightened protection against harassment by malevolent individuals who hide behind a shroud of anonymity, addressing the Court's longstanding concern that the totality of the circumstances test is insufficiently protective (Argyris, 24 NY3d at 1163 [Abdus-Salaam, J., concurring]; id. at 1173-1174 [Rivera, J., [*6]concurring in part and dissenting in part]; see also People v Griminger, 71 NY2d 635, 641 [1988] [explaining that continuing to apply the Aguilar-Spinelli test "will . . . prevent the disturbance of the rights of privacy and liberty upon the word of an unreliable hearsay informant, a danger we perceive under the Gates totality-of-the-circumstances test"]). The test does so by ensuring, in every case, that an informant is neither relying on "incomplete secondhand knowledge" nor is using the accurate information they do possess to falsely accuse someone of a crime (Argyris, 24 NY3d at 1158 [Abdus-Salaam, J., concurring]). It also furthers "the aims of predictability and precision in judicial review of search and seizure cases" and "provide[s] bright line guidance to police personnel in performing their duties" (Johnson, 66 NY2d at 407).
The majority here rejects this approach and instead adopts the less protective federal totality of the circumstances test as the proper standard for determining whether an anonymous tip supplies reasonable suspicion, thus overruling our precedent without providing any explanation for why it believes the federal approach is superior (see majority op at 8; id. at 8 n 3).[FN3] Nor could the majority provide a persuasive explanation, because this Court has already rejected the totality of the circumstances test as inadequate as a matter of state constitutional law. Indeed, refusal to adopt that test is an express point of agreement among the concurring and partial dissenting opinions in Argyris (see 24 NY3d at 1157 [Abdus-Salaam, J., concurring]; id. at 1168 [Read, J., concurring in part and dissenting in part]; id. at 1182 [Rivera, J., concurring in part and dissenting in part]).
In a concurrence, Judge Abdus-Salaam, joined by Judge Graffeo, explained that the Court's "long-standing practice of granting New York citizens enhanced protection against unwarranted police intrusions based on hearsay . . . supports the extension of the Aguilar-Spinelli rule to the evaluation of" whether an anonymous tip gives the police reasonable suspicion (24 NY3d at 1157). Judge Abdus-Salaam reasoned:
"[T]he same concern that caused [the Court] to follow the Aguilar-Spinelli rule in the arrest context is still valid today and applies with equal force to investigatory stops precipitated by anonymous tips. As is true of an arrest premised on uncorroborated anonymous hearsay, a stop based on an unreliable tip may unjustly expose an individual to a high degree of physical intrusion without any credible cause for suspicion. If such stops were permitted, the police could freely abuse the people on authority of the most preposterous reports, and malicious tipsters could easily use incredible rumors to convince the police to physically harass the targets of the tipsters' ire. As in the arrest context, the State Constitution must reduce these dangers by precluding the police from physically seizing an individual based on a tip that does not meet Aguilar-Spinelli's reliability criteria" (id.).
Moreover, Judge Abdus-Salaam observed that New York courts had applied the Aguilar-Spinelli test for nearly 40 years, that New Yorkers and the police alike had become accustomed to it, and that there was no evidence that it was "incomprehensible or unusually burdensome" (id. at 1158). Finally, Judge Abdus-Salaam identified the independent and critical benefits that each prong of the Aguilar-Spinelli test provides in assessing the reliability of an anonymous tip:
"[E]ach prong of the Aguilar-Spinelli test acts as a vital independent safeguard against unwarranted governmental intrusions based on unreliable hearsay. The basis-of-knowledge prong guarantees that the police do not forcibly detain a citizen pursuant to the report of an informant who is honest but has relied on incomplete secondhand [*7]knowledge of the relevant events . . . . The veracity prong separately ensures that the police will not stop someone simply because an unscrupulous informant, who possesses plenty of accurate personal knowledge of what happened, twists the facts to falsely accuse the suspect of a crime" (id. at 1158 [internal citations and quotation marks omitted]).
Thus, Judges Abdus-Salaam and Graffeo unambiguously rejected the totality of the circumstances test in the reasonable suspicion context.
Judge Read, in partial concurrence and dissent, also declined to adopt the totality of the circumstances test in Argyris. She wrote that "the [prosecution] urge[s] us to dispense with the requirement for predictive information and adopt a totality-of-the-circumstances or some other more expansive test to justify a forcible stop based on an anonymous tip," but that she "would adhere to our Moore precedent and answer 'No' " (24 NY3d at 1168). Additionally, in my partial concurrence and dissent, joined by Chief Judge Lippman, I observed that "we rejected th[e] federal [totality of the circumstances] approach in Johnson, finding our state constitutional standards better protected individual rights" (id. at 1182). Then, as now, in my view, "[t]hat assessment of the totality test is still applicable today and I see no reason to reconsider and resuscitate a standard buried long ago" (id.).
Thus, a majority of the Argyris Court, fully aware of the dangers of anonymous tips and the constitutional rights at risk if we lowered our guard against fabricated allegations of criminality, expressly rejected the federal totality of the circumstances test that the prosecution advocated for in that case, and which the majority now adopts. The legal landscape has not changed since the Court decided Argyris, and anonymous tips are no less unreliable and dangerous today. The only identifiable difference between Argyris and this appeal is the membership of the Court, but that has never been grounds to adopt a position contrary to precedent (see People v Bing, 76 NY2d 331, 338 [1990] [stare decisis "rests upon the principle that a court is an institution, not merely a collection of individuals, and that governing rules of law do not change merely because the personnel of the court changes"]; see also Vasquez v Hillery, 474 US 254, 265 [1986] ["The important doctrine of stare decisis[ ] [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government"]; People v Garvin, 30 NY3d 174, 187 [2017] [same]). At bottom, the majority does not, and cannot, justify its adoption of a test that a majority of the Court unequivocally rejected in Argyris.
III.
Applying the correct standard to the appeal before us, the officers here lacked reasonable suspicion to stop defendant's car. At the time of that intrusion, the police knew that an anonymous caller claimed that someone was shot at a particular intersection. An officer at that intersection contradicted the caller's statement by contemporaneously reporting that no shots were fired, calling into question the tipster's reliability. The tipster's general description of the shooters' race and gender, and of the model and color of the car they occupied, was information entirely unrelated to criminality and did not support a conclusion that the tipster's report was credible. Indeed, the information that the tipster provided was no more suggestive of criminality than what one would notice from observing a car on the road for only a few seconds. While an officer's observations may corroborate a tipster's reliability, here, the officers' observations of defendant a few blocks from the intersection of the alleged shooting in a white Mercedes Benz failed to do so. Furthermore, in this case, the officers' observations that defendant was neither speeding nor attempting to elude the police did nothing to corroborate the tip. Additionally, there were no other telltale signs of a recent shooting, such as people running from the scene, looking for cover, flagging down the officers' car, screaming, or appearing injured.
Notably, although information obtained after the officers decided to stop defendant cannot supply reasonable suspicion of criminality (see People v William "II", 98 NY2d 93, 98 [2002]), defendant's conduct upon being stopped does not provide any suggestion of criminal activity. When the officers activated their lights and siren, defendant immediately pulled over. Upon request, he provided the officers with his license and registration, and he [*8]explained that he was headed home from a baby shower. When the officers asked if there was anything in the car they should know about, defendant invited them to check the car.[FN4]
The majority's analysis fails on its own terms, because it hinges on mischaracterizations of the record. In its summary of the contents of the radio dispatches, the majority suggests that the officers knew more than they did at the time they detained defendant (see majority op at 2). For example, the majority states that the 911 caller provided the address of the shooters' residence and claimed to have "beef with" the shooters, and that the caller had been shot in the arm, without clarifying that the officers did not have this information when they stopped defendant's car (see id.). This muddied narrative is essential to the majority's conclusion because, otherwise, all it can point to is a description of the car that lacked the model and license plate number, and physical descriptions that lacked any unique characteristics and fit all adult Black males in New York City. Contrary to the majority's assertion (see id.), and to the extent that it is relevant to the majority's application of its erroneous standard to the facts, at the hearing, the officer did not testify that the 911 caller was the victim of the shooting when he seized defendant. Rather, the officer only testified that a "911 call came over that a male was just shot." Thus, at the relevant time, the officers' understanding of the situation and the description of the shooters was insufficient to provide them with reasonable suspicion to stop defendant, even under the more expansive and less protective totality of the circumstances test.
The majority appears to rest its application of a less strict test on the fact that investigatory stops requiring reasonable suspicion, rather than probable cause, are a "lesser intrusion" (majority op at 6). This distinction does not justify the majority's departure from precedent. As I have stated previously, "[w]hether the inquiry is to confirm the existence of probable cause for a search or an arrest, or the reasonable suspicion to stop and detain," the Court must "carefully scrutinize the anonymous informant and the tipster's information, and . . . require corroboration that provides a basis for an officer's supported belief of criminal conduct, taking into account that the source of information is unknown and untested" (Argyris, 24 NY3d at 1177 [Rivera, J., concurring in part and dissenting in part]). Although the majority asserts that the totality of the circumstances test still "involves an analysis of the Aguilar-Spinelli reliability and basis of knowledge factors" (majority op at 8), it provides no guarantee that those factors will receive the weight that their significance requires, or that other factors will not outweigh them. The majority agrees that there are inherent risks in relying on an anonymous tip, and that there must be some minimum, reasonable showing that an anonymous tip is reliable (id. at 8 n 3), but it abandons the very safeguards that require an anonymous tip to bear sufficient indicia of reliability. They do so in exchange for a standard that by its very nature involves a discretionary balancing of factors.
Significantly, the majority fails to explain why adoption of a less protective standard benefits New Yorkers. Experience and logic suggest the contrary, because investigatory stops regularly lead to searches and seizures of the occupants and the vehicle, as was the case here. If the police can rely on an anonymous tip to seize an individual without sufficient assurances of that tip's reliability and accuracy, and, in turn, use the information they acquire from the stop to make an arrest, then the majority has effectively eroded the standard for probable cause. Put another way, police conduct based on reasonable suspicion may escalate based on probable cause developed during the initial encounter, and accordingly, we should not apply a more protective standard to one but not the other.
IV.
The police stopped defendant's car based on an anonymous tip that provided no allegations of criminal behavior that the officers could corroborate. Moreover, the tip failed to provide a description of the shooters beyond that they were Black men in a white Mercedes Benz. This information, on its own, did not constitute reasonable [*9]suspicion. To be clear, the police did not have to ignore the tip, even if an officer at the scene reported that no shots had been fired, but they could have instead taken appropriate investigatory steps, such as following the car. Here, however, the police immediately stopped defendant's car as soon as they saw that it matched the tip's vague description of the car and its occupants, ignoring the red flags suggesting that the tip was unreliable. Notably, the majority admits that the "result here might be different" had the police known that the alleged shooting occurred in Mount Vernon prior to making the car stop (majority op at 10). Had the police conducted even a minimal investigation once they saw the Mercedes Benz, rather than immediately initiate a car stop, they would have received that information from a radio dispatch first, casting more doubt on the reliability of the anonymous tip. The police missed that critical information in their haste to initiate the car stop without investigation, based on their undue deference to the anonymous tip. Thus, the majority's endorsement of the police's conduct flies in the face of the Court's decades of warnings about the dangers of such a tip.
Our Constitution permits officers to follow leads, but if the police want to forcibly stop someone, they cannot solely rely on an anonymous tipster's unsubstantiated allegation of a crime. At a time when the police are increasingly soliciting tips to assist with investigations, and the phrase "if you see something, say something" has become ubiquitous, it is all the more critical that law enforcement and the courts remain vigilant against malicious anonymous tipsters and those relying on mere rumor and suspicion.
I dissent.
Order affirmed. Opinion by Judge Cannataro. Judges Garcia, Singas, Troutman and Halligan concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.
Decided November 25, 2025

Footnotes

Footnote 1: Officer Shelley testified at the suppression hearing that he initially told defendant he was being stopped for the Vehicle and Traffic Law violation of excessive window tint because he wanted defendant to think it was a "routine car stop," rather than an investigation of a reported shooting. Although the officer testified that he issued defendant a summons for the excessively tinted windows, no summons was produced. Supreme Court rejected the proposition that the vehicle stop was based on the officer's observation of a traffic infraction (cf. People v Hinshaw, 35 NY3d 427, 430 [2020]).
Footnote 2: The dissent's characterization of our holding in Argyris as a four-Judge majority adopting Aguilar-Spinelli lacks any support in the plain language of the opinion. To the contrary, the majority opinion expressly states, "[r]egardless of whether we apply a totality of the circumstances test or the Aguilar-Spinelli standard, there is record support for the lower courts' findings that the stops were lawful" (24 NY3d at 1140 [citations omitted]), thereby expressly leaving open the issue of what test would ultimately be adopted. The dissent offers no authority for the proposition that we would go behind a majority opinion to count votes from concurring and dissenting opinions to create binding precedent on an issue that was not necessary to the Court's holding.
Footnote 3: It remains the case that our courts do not "blithely accept as true the accusations of an informant unless some good reason for doing so has been established," and therefore a finding of reasonable suspicion must still be based on "some minimum, reasonable showing" that the anonymous tip is reliable (see Griminger, 71 NY2d at 639 [internal quotation marks and citation omitted]). Given the risks inherent in relying on anonymous tips, a tipster's basis of knowledge and veracity remain "highly relevant in determining the value of [their] report" (Gates, 462 US at 230) and should be considered in the totality-of-the-circumstances analysis. Likewise, although corroboration of a tip's assertions of criminality may not be strictly required in every case, it remains a relevant factor that may be considered in making reliability determinations.
Footnote 4: We do not address whether a vehicle stop would be warranted to investigate any report of a completed offense (see Navarette, 572 US at 402 n 2; United States v Hensley, 469 US 221, 229 [1985]).
Footnote 1: As I conclude that the police had no lawful basis to stop defendant's car, I would not reach the question of whether the police validly searched the glove compartment after the stop.
Footnote 2: Notably, the facts in Johnson, where the Court decided to continue applying the stricter Aguilar-Spinelli test, involved the less suspect circumstances of a non-anonymous tip (66 NY2d at 400; see also Argyris, 24 NY3d at 1177 [Rivera, J., concurring in part and dissenting in part] ["Unlike a known informant, an anonymous informant has no history with law enforcement, and no track record of having provided reliable information in the past. Deprived of the informant's identity, the police have no basis upon which to conclude that the tipster may be trusted"]).
Footnote 3: The majority goes so far as to render the corroboration of criminality a peripheral consideration to a court's determination of whether an anonymous tip is sufficiently reliable to provide reasonable suspicion for a stop (see majority op at 8 n 3). Under the majority's watered down standard, corroboration of criminality—historically, the single most telling factor in the analysis—is now of little to no consequence at all. That standard contravenes our consistent admonition that anonymous tips are unreliable sources of information, and that police overreliance on such tips is "highly dangerous" (De Bour, 40 NY2d at 225 [internal quotation marks omitted]; Taggart, 20 NY2d at 343; People v Russ, 61 NY2d 693, 695 [1984] [noting the "weakness of information received from an anonymous source"]).
Footnote 4: As for the anonymous tip, the more that the police learned, the more the caller's reliability was called into question. The caller refused police assistance despite claiming that they had been shot. They also tried to stop the 911 dispatcher from calling an ambulance by stating that they were already headed to the hospital. However, a police canvas of nearby hospitals revealed that no one had appeared with a gunshot wound, and despite the police's best efforts, they could not locate the caller. Thus, there was no way to confirm the alleged shooting. If there even was a shooting, the police should have followed up on the tip by taking additional investigatory steps prior to stopping defendant's car based solely on an anonymous tip that provided nothing more than confirmation that two Black men in a white Mercedes Benz were driving down the street.